IMPERIAL LAUNDRY, INC. *v.* CONNECTICUT STATE BOARD OF LABOR RELATIONS ET AL.

INGLIS, C. J., BALDWIN, O'SULLIVAN, WYNNE and DALY, Js.

Argued May 6—decided June 14, 1955

*Raymond J. Quinn, Jr.,* with whom was *Joseph J. Phelan,* for the appellant (plaintiff).

*Daniel E. Ryan,* assistant attorney general, with whom, on the brief, was *John J. Bracken,* attorney general, for the appellee (named defendant).

*Louis Feinmark,* for the appellee (defendant union).

O'SULLIVAN, J.  On June 10, 1952, the defendant Cleaners, Dyers and Laundry Workers Union, Local 364, herein called the union, filed with the named defendant, to be called the board, a written charge that the plaintiff, herein called the company, was engaged in activities classified as unfair labor practices under General Statutes, § 7392. Subsequently, the board issued its complaint and, with an accompanying notice of the time and place for a hearing, served it on the company.  After holding numerous hearings, at which voluminous evidence was submitted by the parties, the board reached the conclusions, among others, that the company had interfered with its employees in the exercise of rights guaranteed by § 7392, that it had discharged five employees because of their union activities, and that it had refused to negotiate in good faith with the union.  The board thereupon issued an order that the company (1) cease and desist from interfering with its employees in their pursuit of the right to organize and to bargain collectively through representatives of their own choice, (2) proceed, upon request, to bargain collectively with the union, and (3) offer to reinstate three of the discharged employees whom it had refused to rehire, with compensation for the loss of pay suffered by them.  Claiming to be aggrieved by the order, the company appealed to the Superior Court.  The court affirmed the action of the board, except in one particular

concerning which the parties raise no question, and from the judgment rendered the company has appealed to this court. The appeal presents two assignments of error, first, the failure of the court to set aside the findings of fact and conclusions of the board, and, second, the ruling of the court that the individuals whom the company was ordered to offer to reinstate were employees when the order was issued. We shall examine these in sequence.

Chapter 370 of the General Statutes is entitled "Labor Relations Act." Originally enacted in 1945,[1] it was predicated upon, and its phraseology patterned after, the National Labor Relations Act of 1935. 49 Stat. 449, 29 U.S.C. §§ 151-166. For this reason, the judicial interpretation frequently accorded the federal act is of great assistance and persuasive force in the interpretation of our own act. See *Arnold College* v. *Danaher*, 131 Conn. 503, 507, 41 A.2d 89.

The labor relations board, created by General Statutes, § 7389, is required to hold hearings on all complaints charging an employer with any of the enumerated unfair labor practices. §§ 7394 (4), 7392. The employer is given the right to file an answer and to appear in person or otherwise to defend against the complaint. Ibid. "If, upon all the testimony, the board determines that the employer has engaged in or is engaging in any unfair labor practice, it shall state its finding of fact and shall issue and cause to be served on such employer an order requiring him to cease and desist from such unfair labor practice, and shall take such further affirmative action as will effectuate the policies" of the chapter. § 7394 (5). The legislature has provided that any person aggrieved by a final order of

---

[1] General Statutes, Sup. 1945, §§ 933h-946h.

the board may obtain a review thereof in the Superior Court by filing a petition praying that the order be modified or set aside. § 7395 (4). One phase of the procedure for review is dissimilar to that followed in appeals from awards of workmen's compensation and unemployment commissioners. In those appeals, a motion to correct the finding is not only permitted but on most occasions foreshadows the decisive assignment of error that there was no evidence to support specific subordinate facts found. In cases originating before the labor relations board, a motion to correct is not available. The review is had upon the entire record, which the board must certify and file in court. § 7395 (4). This record includes what § 7394 (5) calls a "finding of fact." Such a finding need not incorporate the set of subordinate facts customarily included in a finding. It complies with the statute if it states the ultimate finding upon each charge of unfair labor practice. The Superior Court, to which the aggrieved person comes, does not try the matter de novo. Its function is not to adjudicate the facts. *Lanyon* v. *Administrator,* 139 Conn. 20, 28, 89 A.2d 558; see *DeMond* v. *Liquor Control Commission,* 129 Conn. 642, 645, 30 A.2d 547. It can do nothing more, on the factual questions, than to examine the record to determine whether the ultimate findings of the board were supported, as the statute requires, by substantial evidence. § 7395 (2). If it is determined that they were, the findings cannot be disturbed. Ibid.; see *Carper* v. *Administrator,* 139 Conn. 515, 520, 95 A.2d 378; *Almada* v. *Administrator,* 137 Conn. 380, 391, 77 A.2d 765.

Substantial evidence is evidence that carries conviction. *Matter of Di Nardo* v. *Monaghan,* 282 App. Div. 5, 7, 121 N.Y.S.2d 119. It is such relevant evi-

dence as a reasonable mind might accept as adequate to support a conclusion. *Consolidated Edison Co.* v. *National Labor Relations Board,* 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126. It means something more than a mere scintilla and must do more than create a suspicion of the existence of the fact to be established. *Purity Food Co.* v. *Connecticut State Board of Labor Relations,* 17 Conn. Sup. 199, 204; *National Labor Relations Board* v. *Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300, 59 S. Ct. 501, 83 L. Ed. 660; *McCague* v. *New York, C. & St. L.R. Co.,* 225 Ind. 83, 89, 71 N.E.2d 569; *Pennsylvania State Board* v. *Schireson,* 360 Pa. 129, 133, 61 A.2d 343. To be sure, the statute provides that the board shall not be bound by technical rules of evidence prevailing in the courts. § 7394 (4). This provision was undoubtedly adopted by the General Assembly to give this administrative agency more freedom to investigate than a court enjoys. But this freedom does not permit the board to base its orders on evidence having no rational probative force. *Consolidated Edison Co.* v. *National Labor Relations Board,* supra, 230; *Sinclair* v. *Director,* 331 Mass. 101, 103, 117 N.E.2d 164.

The question, then, that the court had to answer was whether there was substantial evidence before the board to warrant its ultimate findings. From the evidence submitted by the parties, the board could reasonably have found the following facts: The company is engaged in the laundry and dry-cleaning business in Waterbury. During the time of these narrated events, Milton A. Gardner, vice president, and Gerald T. Reuter, sales manager, were in active charge of the business. On June 3, 1952, the company had in its employ forty-five persons, some classified as inside, and others as outside, employees. The

latter consisted of five delivery drivers, John J. Bergin, Sr., John F. Reilly, Maurice St. Pierre, Henry J. Collette and Lomer R. Belval. During the preceding January, a movement to organize the employees was begun. The plan was to organize the inside workers into one bargaining unit and the five drivers into another. From the very beginning, the movement was bitterly opposed by Gardner and Reuter. On first hearing about it, they arranged for and held meetings with the inside workers. On those occasions, Gardner and Reuter tried to discourage membership in the proposed local and referred to the union's organizers in a disparaging and offensive manner. To counteract the movement, the company granted the inside employees certain economic benefits such as additional paid holidays and a free hospitalization and medical program. Furthermore, the company promised that it would apply to the office of price stabilization for a change in rates, which, if granted, would permit a wage increase. The antiunion hostility of the company was so strong that on January 31, 1952, Reuter discharged one inside worker and on the following day Gardner discharged another because of their union activities. By methods such as those described above, the company succeeded in thwarting the unionization of the inside workers.

The company was equally antagonistic toward the plan of the drivers to organize, but its efforts proved unsuccessful. On January 17, 1952, the drivers joined the union and on January 29 unanimously designated it as their exclusive bargaining representative. The company, however, continued its attempt to interfere. Early in February, it offered $1000 to one of the drivers as an inducement to have him exert his influence over the other four and urge

them to withdraw from the union. On February 5, the board certified the union as the exclusive representative of the drivers for collective bargaining purposes. Negotiations began shortly thereafter and continued intermittently until April 2. During February, the drivers complained about the dilatory tactics of the company in negotiating a contract and threatened to strike. After an agent from the state board of mediation and arbitration interceded at the company's request, negotiations were resumed and culminated in an oral agreement concerning the terms and conditions of the proposed contract. The parties agreed that their understanding should be reduced to writing by the attorney for the company and that the attorney for the union should prepare a joint application to be forwarded to the wage stabilization board for approval of an increase in commissions and certain fringe benefits. Certain data needed to comply with the requirements of the wage board were to be obtained by the company and submitted to the union. This was never done. After April 2, the company continued its efforts to frustrate the union. Miss Mary McCarthy, the president and chief stockholder of the company, tried to persuade the drivers to abandon their membership in the union. On one occasion she told one of the drivers that a certain lawyer could tell him how they could withdraw from the union and still retain their jobs. She gave him the lawyer's telephone number, and, in her presence, the driver telephoned the lawyer and made an appointment.

The union, by letter dated May 5, 1952, advised the company that unless the contract was signed by May 10, 1952, it would conclude that the company was not bargaining in good faith. The contract still remained unsigned on June 1. On the evening of

that day, all the drivers except Belval met with the union's representatives. The men knew of the contents of the letter of May 5 and believed that the company had no intention of executing the contract at any time. Pursuant to a plan devised at the meeting, all five drivers went to the laundry on the following morning but refused to make deliveries on their various routes until the contract was signed. They stayed around the laundry the entire day, limiting themselves to making and correcting tickets for use in the addressograph, and a few other odd jobs. On the following day, June 3, they again appeared at the laundry at the customary starting time. They again said that they would not work their routes until the contract was signed. About 11:45 a.m., Reuter met with and asked them whether they were going to make deliveries. Upon being told that they would not do so until the company signed the contract, Reuter discharged them. Two of the drivers, Collette and Belval, were later notified that they had not been discharged but merely suspended. They were subsequently reinstated. The three other drivers were not re-employed.

The mere recital of the foregoing is ample to demonstrate that there was substantial evidence of all save one[2] of the unfair labor practices charged in the complaint. Contrary to the provisions of § 7391,[3] the company indulged in a course of con-

---

[2] Among the several charges, set forth in the complaint, of interference by the company with the rights of the employees to organize was one alleging that the interference consisted of "[c]hanging the working conditions of certain of the employees resulting in a loss in their weekly earnings, for the purpose of discouraging their interest, activity and membership in the union." The board expressly found that this charge had not been established and dismissed it.

[3] "Sec. 7391. RIGHTS OF EMPLOYEES. Employees shall have the right of self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choice and

duct designed to interfere with its employees' right of self-organization and of engaging in concerted activities for the purpose of collective bargaining. The company also violated certain provisions of § 7392[4] and by so doing has been guilty of unfair labor practices. Because of its findings, the board entered a cease and desist order against the continued violation of these statutes. The board also ordered that the company offer to reinstate Bergin, Reilly and St. Pierre and that they be given back pay less any wages earned by them since June 3. This phase of the board's action is seriously challenged and brings us to a discussion of the second assignment of error. This assignment is, as previously stated, that the court erred in affirming the order because, as a matter of law, Bergin, Reilly and St. Pierre had been discharged for cause and were not employees of the plaintiff when the order was entered.

The board has jurisdiction only over those between whom there exists the relationship of employer and employee. The contention urged by the company that the board acted without jurisdiction in ordering the reinstatement of the three drivers with back pay rests on the assumption that the relation-

---

to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection, free from actual interference, restraint or coercion by employers."

[4] "Sec. 7392. UNFAIR LABOR PRACTICES. It shall be an unfair labor practice for an employer . . . (4) to require an employee or one seeking employment as a condition of employment . . . to refrain from forming or joining or assisting a labor organization of his own choosing; (5) to . . . discourage membership in any labor organization by discrimination in regard to hire or tenure or in any term or condition of employment . . . ; (6) to refuse to bargain collectively with the representatives of employees . . . ; . . . or (10) to do any acts other than those enumerated in this section which restrain, coerce or interfere with employees in the exercise of the rights set forth in section 7391."

ship of employer and employee had come to an end when, on June 3, 1952, the company discharged them. This contention ascribes a fallacious significance to the oral words of discharge uttered by Reuter on that day. Under certain circumstances, the relationship existing between employer and employee is not terminated, for the application of the Labor Relations Act, in so cavalier a manner. The act enlarges the ordinary concept of the status of an employee. It provides that the word "employee" shall "include, but shall not be restricted to . . . any individual whose employment has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment." § 7388 (7).

The Labor Relations Act does not interfere with the normal exercise of an employer's right to discharge his employees. The discharge, however, must not amount to a subterfuge to circumvent the provisions of the act. *Williams Motor Co.* v. *National Labor Relations Board,* 128 F.2d 960, 964. Discharge is legally possible as long as the employer does not, under cover of his rights, attempt to intimidate or coerce his employees with respect to their self-organization and representation. *National Labor Relations Board* v. *Jones & Laughlin Steel Corporation,* 301 U.S. 1, 45, 57 S. Ct. 615, 81 L. Ed. 893. Where employees have been discharged as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, their employment has not been terminated. See *National Labor Relations Board* v. *Cape County Milling Co.,* 140 F.2d. 543, 545.

The company relies almost exclusively, in justifying its claimed discharge, upon the events of June

2 and 3. This is too narrow a view to take. The whole history of the events which had occurred since the employees began to organize must be considered. The attitude of the drivers on June 2 and 3 is not to be commended but, under the circumstances, is not controlling. As the court so aptly observed in its memorandum of decision, "When the men adopted their misguided course of conduct on June 2nd and 3rd which cannot be approved of as lawful concerted activities, the employer promptly discharged them. No assurance was then given them that the contract, so long delayed, would be forthcoming. They did one wrong thing and were promptly penalized although the Laundry had done one wrong thing after another for five months. From this whole picture the Board has drawn the inference that the insubordination was not the real reason for the discharge but was merely a pretext, avidly seized upon to get rid of these men for the unwelcome union activities." The cases cited by the company are clearly distinguishable. The court was correct in ruling that the order of the board involved individuals who still remained employees of the company.

There is no error.

In this opinion the other judges concurred.