CONNECTICUT STATE LABOR RELATIONS BOARD *v.* CONNECTICUT YANKEE GREYHOUND RACING, INC., ET AL.

COTTER, C. J., LOISELLE, BOGDANSKI, LONGO and PETERS, Js.

Argued June 23—decision released August 8, 1978

*Barclay Robinson, Jr.,* and *Emanuel N. Psarakis,* with whom was *Todd F. Brady,* for the appellants (defendants).

*William R. Darcy,* general counsel, with whom was *Fleming James, Jr.,* for the appellee (plaintiff).

COTTER, C. J. The underlying issue raised on this appeal is whether, in a representation hearing pursuant to General Statutes § 31-106 (b),[1] the

---

[1] "[General Statutes] Sec. 31-106. ELECTION OF REPRESENTA-TIVES. . . . (b) When it is complained by an employee or his representative that there is a question or controversy concerning the representation of employees, the board shall hear the matter and order an election, or use any other suitable method to ascertain such representatives. When it is complained by an employer or his representative that there is a question or controversy concerning the representation of employees between two or more labor organizations, the board shall hold a public hearing on such complaint after due notice. If after hearing the board finds that there is a controversy concerning the representation of employees, it may conduct an election or use any other suitable method to ascertain such representatives. . . ."

state board of labor relations, hereinafter the board, is bound by the present federal *procedural* rule which bars from representation proceedings any evidence tending to show the existence of an unfair labor practice.

The facts and events which gave rise to the present controversy will help to place the issues in a meaningful context. The defendants, Connecticut Yankee Greyhound Racing, Inc., and Connecticut Yankee Catering Co., Inc., operate various phases of the greyhound racing establishment in Plainfield, Connecticut. Many of the defendants' officers are also officers of Yankee Greyhound Racing, which operates a racetrack at Seabrook, New Hampshire, similar to the Plainfield track, and there is a close relationship between the Connecticut and New Hampshire companies. Local 402 of the Dolls, Toys and Novelties Union (Racetrack Division) AFL-CIO, hereinafter Local 402, represents the employees at Seabrook and has had a collective bargaining agreement with the Seabrook employer for a substantial period of time.

Andrew Bellamare, a business agent of Local 402 in charge of organizing, negotiating, and administering contracts in various locations including Seabrook and Plainfield, induced his daughter, her husband and another woman, all unemployed members of Local 402, to go to Plainfield in the late fall and early winter of 1975, while the track was still under construction, to seek employment at the track and to help organize employees for Local 402. The track opened for operation on January 2, 1976. Although a few employees were hired before that date, most were told that January 2 would be the effective date of hire.

From late December, 1975, through January 5, 1976, representatives of Local 402 conducted an organizing campaign by distributing among employees and prospective employees application cards for union membership. These cards had a place for the applicant's signature, and were supposed to be signed and witnessed. On January 5, 1976, Bellamare collected all the signed cards and went to see Thomas Carney, an official of the defendants whom Bellamare had known in Seabrook. Bellamare told Carney that he had cards from a majority of the employees and demanded recognition for Local 402. Carney expressed his desire to hold an election; Bellamare insisted on a card count.

A card count was conducted in Hartford on January 7, 1976, by Stephen McCloskey, an independent labor consultant from Massachusetts who is a member of the American Arbitration Association and a former member of the Massachusetts labor relations commission. On the day the count was to be held, Bellamare was furnished at the track with a list of employees. This list, which Bellamare was to take to McCloskey for the purpose of the card count, was in the form of a computer printout and contained no signatures; Bellamare took this list and the cards in his possession to McCloskey in Hartford. No documents containing employee signatures were furnished to McCloskey. Although it is the invariable practice in card counts conducted under the auspices of the state board or of the national labor relations board, hereinafter the NLRB, to compare purported signatures on cards with admittedly genuine signatures,[2] McCloskey made the card count by simply comparing the

---

[2] The services of the labor department are available to conduct a card checkoff without charge to the parties.

*names* on the cards with the *names* on the list. No attempt was made to ascertain the genuineness of the signatures on the cards.

McCloskey determined that 57 percent of the names on the list also appeared on the cards, and he informed the parties of his finding. The defendants immediately recognized Local 402 and commenced bargaining. Collective bargaining agreements were concluded and executed between the defendants and Local 402 on February 7, 1976. The defendants then posted a notice announcing to all employees that an agreement had been signed with Local 402 on February 8, that a card check had been conducted and it had been determined that Local 402 represented a majority of track employees, that the labor agreement was effective as of February 8, and that Local 402 was the only union authorized to represent employees at the track. Prior to the posting of this notice, no notice had been posted by either the defendants or Local 402 advising employees of the result of the card count or of the recognition of Local 402, and no meeting of union members had been called for any purpose. No vote was ever taken on the terms of the labor agreements.

Between February 12 and April 12, 1976, the board received petitions, severally filed by Locals 531, 334 and 134 of the Service Employees International Union, AFL-CIO, Local 493 of the Teamsters Union, and Local 217 of the Hotel and Restaurant Employees and Bartenders Union, AFL-CIO, alleging, pursuant to General Statutes § 31-106 (b),[3] that a controversy had arisen concerning representation of some or all of the defendants' employees. The board consolidated the petitions and ordered

---

[3] See footnote 1, supra.

a hearing. The defendants, Local 402 and all the petitioning unions were notified, appeared by counsel and were given the opportunity for a full hearing. The hearings before the board extended through five sessions held on April 21, May 17, June 7, July 15 and August 18, 1976.

At the beginning of the first session on April 21, 1976, counsel for the defendants objected initially that, because contracts already existed between the defendants and Local 402 in which Local 402 was recognized as the bargaining representative of a majority of employees, the board was barred from acting on the representation petitions. The petitioning unions asserted their intent to prove that Local 402 did not represent a majority of the defendants' employees and that the contracts were invalid. After a discussion, counsel for the employers agreed "that the basic issue that has to be resolved is whether or not there is a contract that is a bar"; he also agreed to proceed initially with the issue concerning the pending representation petitions. The board's position was that the proceeding was for *representation* purposes only, and that it would hear fully and determine whether the contracts with Local 402 constituted a bar to action on the petitions.

After hearing all the evidence the board issued a finding reciting the aforementioned events. It further found that, after the card count was taken in Hartford on January 7, 1976, the list and cards were returned to Bellamare, who informed the board that he had destroyed the cards and that the list had "just disappeared." On the basis of its findings, the board concluded, inter alia, that, "[a]t the time the contracts were executed, Local 402 was

not certified by the Board as bargaining agent and was not shown by a preponderance of the evidence to have been chosen by a majority of employees in said units to be their representative"; that "[t]he contracts do not therefore constitute a bar to the elections sought by the petitioners"; and that "[t]he purposes of the Act will best be served by an election conducted under auspices of the Board."

Pursuant to the board's order, secret ballot elections were held in February, 1977. In those elections, 152 employees of Connecticut Yankee Greyhound Racing, Inc., voted in favor of Service Employees International Union, AFL-CIO (New England Racetrack Division), 2 in favor of the Teamsters Union, 4 in favor of Local 402, and 53 for no union. The employees of Connecticut Yankee Catering Co., Inc., cast 51 votes in favor of Local 217, Hotel and Restaurant Employees and Bartenders Union, AFL-CIO, 4 for the Service Employees Union, 6 for Local 402, and 17 for no union. The defendants and Local 402 filed objections to the elections which, after a full hearing, were dismissed by the board on May 6, 1977. At that time, the unions which received the majority of votes were certified by the board as collective bargaining representatives of the defendants' employees.

The defendants refused to bargain with the newly certified unions and unfair labor practices charges were filed with the board in late May and early June, 1977. The board determined that the defendants were violating General Statutes § 31-105 (6) by refusing to bargain collectively with certified representatives of their employees, and, on August 18, 1977, it ordered the defendants to bargain in good faith with the certified unions. When the defendants

refused to comply with this order, the board brought a petition to the Superior Court for enforcement, pursuant to General Statutes § 31-109.

It was the defendants' claim in the petition for enforcement proceedings that the board's decision ordering an election was illegal because it had, in fact, decided an unfair labor practice complaint rather than a representation issue. After a full hearing on the merits, the court found that "[t]he procedure adopted was a lawful means for deciding the question or controversy concerning representation," that "the facts found by the Board clearly supported its conclusion that Local 402 was not proved to have been chosen by a majority of the employees," and that "[t]he procedure involved no arbitrary or capricious exercise of administrative discretion." Accordingly, judgment was rendered ordering the defendants to comply in all respects with the August 18, 1977, order of the board. It is from that judgment that the defendants have appealed to this court.

Although the defendants raise numerous claims of error on appeal,[4] the essence of these claims involves and can be reduced to two issues: (1) In a representation hearing, does the state board have discretion to admit evidence of conduct which may

[4] The specific claims of the defendants are as follows:

"1. Did the Superior Court err in holding that the State Board of Labor Relations ('Board') lawfully admitted evidence of unpleaded unfair labor practices in a representation petition hearing and lawfully refused to recognize certain contracts as bars?

"2. Did the Superior Court err in failing to hold that the Board's rule requiring a party asserting a contract as a bar to prove a majority erects an unlawful presumption of illegality in excess of the Board's powers?

"3. Did the Superior Court err in failing to hold that the Board's admission of evidence of unfair labor practices in a representation

constitute an unfair labor practice in order to determine whether a contract should be a bar to an election; and (2) by permitting the introduction of such evidence, and by placing the burden on the employers to prove that the contract which they asserted as a bar was executed with a union which had represented a majority of employees, did the board deny the defendants due process.

Chapter 561 of the General Statutes is entitled "Labor Relations Act." "Originally enacted in 1945, it was predicated upon, and its phraseology patterned after, the National Labor Relations Act of 1935. 49 Stat. 449, 29 U.S.C. §§ 151–166. For this reason, the judicial interpretation frequently accorded the federal act is of great assistance and persuasive force in the interpretation of our own act. See *Arnold College* v. *Danaher*, 131 Conn. 503, 507, 41 A.2d 89." *Imperial Laundry, Inc.* v. *Connecticut State Board of Labor Relations*, 142 Conn. 457, 460, 115 A.2d 439; *Winchester* v. *Connecticut State Board of Labor Relations*, 175 Conn. 349, 354, 402 A.2d 332; *Norwich* v. *Norwich Fire Fighters*, 173 Conn. 210, 215, 377 A.2d 290. While the interpretation of provisions of the federal act may be extremely helpful, however, neither the state board nor our courts are compelled to slavishly follow policies which have been adopted by the NLRB for the purpose of ensuring administrative

proceeding prevents the reviewing court from applying the proper standard of review?

"4. Did the Superior Court err in failing to hold that the Board in fact decided an unfair labor practice case and that its findings and conclusions were not supported by substantial evidence?

"5. Did the Superior Court err in failing to hold that the defendants and Local 402 were not given notice of the true nature of the proceeding, and that the Board did not cure the failure to give such notice?"

efficiency at the federal level. For example, insofar as such a policy reflects an attempt by the NLRB to deal with its own caseload problems in the context of a procedural framework which differs from our own, strict adherence to such a policy under our state act may be neither particularly helpful nor effective.

What is commonly known as the "contract-bar rule" is one such policy established by the NLRB. This so-called "rule" apparently first emerged in 1938 in the case of *In re Superior Electrical Products Co.*, 6 N.L.R.B. 19, 22, 2 L.R.R.M. 105, and has been consistently applied since that date. See, e.g., *National Labor Relations Board* v. *Local 3, International Brotherhood of Electrical Workers*, 362 F.2d 232 (2d Cir.). A clear statement of this policy appears in a 1960 federal decision: "The Board has normally refused to proceed to an election, in the presence of a collective bargaining contract, where the contract, granted exclusive recognition, is to be effective only for a reasonable period and was negotiated by a union representing at the time a majority of the employees, prior to any claim by a rival labor organization." *Local 1545, United Brotherhood of Carpenters & Joiners of America* v. *Vincent*, 286 F.2d 127, 130 (2d Cir.), quoting NLRB Seventh Annual Report (1942), p. 155. Stated simply, under the "contract-bar" doctrine, "a current and valid contract will ordinarily prevent the holding of an election."[5] Morris, The Developing Labor Law (Cum. Sup. 1971–75), p. 97.

---

[5] The employer is barred from challenging the incumbent union for the duration of the contract while, under current NLRB law, rival unions are barred for a maximum of three years, regardless of the contract's duration. Morris, The Developing Labor Law (Cum. Sup. 1971-75), p. 100.

Although this doctrine does not find its source in any express statutory language, it is now recognized by implication in § 8 (b) (7) of the federal act. See Morris (1971 Ed.), op. cit., p. 167. Nevertheless, it is well settled that the "contract-bar" is a doctrine that is self-imposed by the NLRB; it is "a procedural rule which the Board in its discretion may apply or waive as the facts of a given case may demand in the interest of stability and fairness in collective bargaining agreements." *National Labor Relations Board* v. *Grace Co.,* 184 F.2d 126, 129 (8th Cir.); *Local 1545, United Brotherhood of Carpenters & Joiners of America* v. *Vincent,* supra, 131. Since "[t]he Board is not the slave of its [own] rules"; *National Labor Relations Board* v. *Grace Co.,* supra; the contract-bar policy and the exceptions thereto may be reasonably expanded or restricted as it sees fit.[6] *Kearney & Trecker Corporation* v. *National Labor Relations Board,* 210 F.2d 852, 857 (7th Cir.). "The establishment, application, and modification of the Board's contract-bar rules . . . [therefore are] considered to have been committed to its discretion without statutory restraint or judicial review." Morris (1971 Ed.), op. cit., pp. 167–68.

In the present case, the plaintiff state board does not suggest that the "contract-bar rule" itself is

---

[6] One salient example of the NLRB's exercise of this discretion is the fact that it has altered the length of the bar on a number of different occasions. See *Leedom* v. *International Brotherhood of Electrical Workers,* 278 F.2d 237, 242 n.20 (D.C. Cir.). In *Leedom* (p. 242), Judge Bazelon acknowledged the wide latitude entrusted to the board with the observation that "Congress relied on the Board's expertise to harmonize the competing goals of industrial stability and employee freedom of choice to best achieve the ultimate purposes of the Act. Thus, when the Board exercises this discretion in determining that a shorter contract bar rule is now necessary, its judgment is entitled to great weight."

totally inapplicable in state proceedings; on the contrary, the board indicates that the doctrine would be applied in an appropriate case. The real basis of the dispute between the parties to this action is the plaintiff board's failure to adopt the NLRB's rigid policy for determining whether the prerequisites for the utilization of the doctrine have been satisfied.

Under the present policy of the federal board, strict rules of procedure govern the application of the contract-bar rule. When a contract is asserted as a bar in a representation proceeding, the NLRB will confine itself to an examination of the validity of the contract on its face. *In re Paragon Products Corporation,* 134 N.L.R.B., No. 86, p. 662, 49 L.R.R.M. 1160. Unless a contract contains a provision which is "clearly unlawful on its face, or which has been found to be unlawful in an unfair labor practice proceeding," it will bar a representation petition. Id., 666. Accordingly, in a representation proceeding, the NLRB has refused to admit extrinsic evidence tending to establish the alleged unlawful character of a contract provision. *In re Saint Louis Cordage Mills,* 168 N.L.R.B., No. 135, p. 981, 67 L.R.R.M. 1017. Consistent with this policy, therefore, where the majority status of a union is challenged in a representation proceeding, it is the "general practice" of the NLRB "to refuse to admit evidence on the question whether or not a majority of employees covered by such a contract had actually designated the contracting union as their representative at the time the contract was made." *In re U.S. Rubber Co.,* 62 N.L.R.B., No. 100, pp. 795, 797 n.1, 16 L.R.R.M. 212; *In re Columbia River Salmon & Tuna Packers Assn.,* 91 N.L.R.B., No. 222, p. 1424, 27 L.R.R.M. 1025. Thus, under the current

federal procedure, a contract that is valid *on its face* will be presumed valid in all other respects, and this presumption can be rebutted only by the introduction into evidence of an *adjudication* of an unfair labor practice relating to the contract or its formation.

This rigid NLRB practice of presuming the validity of a comprehensive collective bargaining agreement which is facially valid and thus excluding the admission of extrinsic evidence in a representation proceeding has not, however, always been the policy of the federal board. In *In re Baltimore Transit Co.,* 59 N.L.R.B., No. 35, p. 159, 15 L.R.R.M. 118, for example, while the NLRB noted (pp. 162–64) that it has found it "to be convenient and practicable, for the most part, rigidly to exclude any proffered evidence of unfair labor practices in a representation proceeding," it emphasized that it has also found, on many occasions, "that the purposes of the Act would best be effectuated by enlarging the usual scope of its inquiry in a representation proceeding, and considering matters pertaining to unfair labor practices." See also *Madden* v. *Brotherhood & Union of Transit Employees,* 147 F.2d 439, 441 (4th Cir.). Although the present position of the NLRB is apparently to the contrary, earlier statements by the board itself, such as the one cited above, clearly indicate a recognition and implementation of the principle that "Congress has entrusted the Board with a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees." *National Labor Relations Board* v. *A.J. Tower Co.,* 329 U.S. 324, 330, 67 S. Ct. 324, 91 L. Ed. 322; *National Labor Relations Board* v. *Wyman-*

*Gordon Co.,* 394 U.S. 759, 767, 89 S. Ct. 1426, 22 L. Ed. 2d 709. Administrative flexibility, one of the principal reasons for establishing regulatory agencies in the first place, is an invaluable asset which permits experimentation and allows administrative policies to reflect changing policy views. *Leedom* v. *International Brotherhood of Electrical Workers,* supra, 243; see Gellhorn & Byse, Administrative Law (5th Ed., 1972), pp. 1–6.

The Connecticut labor board, like the NLRB, has broad discretion in administering the state labor laws. Although Connecticut labor law is closely patterned after the federal law, there are notable differences in the manner in which the state and national boards operate procedurally, which support the state board's departure from current federal policy in the present case. Under the federal system, an unfair labor practice hearing is presided over by an administrative law judge, and the government's case is conducted by an attorney attached to the NLRB's regional office, who is responsible for presenting evidence in support of the complaint. The rules of evidence applicable in federal district courts are controlling, insofar as practicable. NLRB Rules and Regulations § 101.10 (a). A federal *representation* hearing, by contrast, is held before a hearing officer. The hearing is nonadversary in character and is "part of the investigation in which the primary interest of the Board's agents is to insure that the record contains as full a statement of the pertinent facts as may be necessary for determination of the case." Id., § 101.20 (c). Rules of evidence applicable in courts of law and equity are not controlling. Id., § 102.66 (a).

In Connecticut, however, no distinction is made between procedures followed in hearings on unfair

labor practices and in representation hearings. They are both conducted by the board, all parties may participate equally, and the board is not bound by technical rules of evidence. Regs., Conn. State Agencies § 31-101-54.

These differences between the state and federal procedures would, in and of themselves, be sufficient justification for the state board to eschew the present federal policy which prohibits the introduction of evidence of unfair labor practices at representation hearings. Additionally, however, certain statutory differences provide further support for the state board's decision not to follow the federal exclusionary rule. For example, General Statutes § 31-106 (e) explicitly permits the board to exclude a union from the ballot if, *at the representation hearing,* the board has found it to be a company union. Significantly, there is no corresponding provision in the federal labor law; on the contrary, federal law specifically *prohibits* the NLRB from denying a company union a place on the ballot unless it has been found guilty of an unfair labor practice in an *unfair labor practice proceeding.* 29 U.S.C. § 159 (c) (2).

Consequently, as evidenced by the provisions of § 31-106 (e), and in view of the structural differences between state and federal procedures, we cannot conclude, as the defendants urge, that the state board must be absolutely bound by the present strict NLRB policy regarding the application of the contract-bar doctrine. Such a policy is simply an evidentiary device to be used in appropriate cases and need not be mechanically applied by the state board. Cf. *National Labor Relations Board* v. *Dakin & Co.,* 477 F.2d 492, 494 (9th Cir.).

We conclude, therefore, that the state board did not abuse its discretion in admitting evidence on the question of whether Local 402 represented a majority of the defendants' employees when the contracts asserted as a bar were executed. The state board is not bound to follow the purely procedural, federal rule which currently bars such evidence from representation proceedings. "Because the relation of remedy to policy is peculiarly a matter for administrative competence, courts must not enter the allowable area of the Board's discretion and must guard against the danger of sliding unconsciously from the narrow confines of law into the more spacious domain of policy." *Phelps Dodge Corporation* v. *National Labor Relations Board,* 313 U.S. 177, 194, 61 S. Ct. 845, 85 L. Ed. 1271.

The remaining claims of the defendants allege, inter alia, that the board's admission, in a representation proceeding, of evidence which tended to establish the commission of an unfair labor practice created an unlawful presumption of the contract's illegality, amounted to an illegal adjudication of an unfair labor practice, and denied the defendants notice of the true nature of proceedings.

Since we conclude that the presumption of a contract's validity followed by the NLRB was not, under the circumstances of the present case, binding on the state board, the affirmative defense of contract bar, which was asserted by the defendants, quite naturally had to be proven by them by a fair preponderance of the evidence. See *Pawlinski* v. *All-state Ins. Co.,* 165 Conn. 1, 7, 327 A.2d 583; 1 Stephenson, Conn. Civ. Proc. (2d Ed.) § 127 (e), p. 523. As the board pointed out in the present case, the NLRB's policy of presuming the validity of a comprehensive bargaining agreement "does not

accord with the actual probabilities in a case like this where the labor organization has not been certified by the Board or shown to be the majority choice by a card check conducted by the Board or in a manner which complies with the Board's simple safeguards." Under these circumstances, the board did not act illegally, arbitrarily or in abuse of its discretion by concluding that the defendants had not satisfied their burden of establishing the validity of the contract because they failed to prove that Local 402 represented a majority of the employees at the time the contract was executed.

When a complaint is made to the board that "a question or controversy concerning the representation of employees" exists, it is the board's responsibility under § 31-106 (b) of the General Statutes to assure the employees of their right to be represented for the purpose of collective bargaining by a union or association which has been chosen by a majority. In the present case, the board considered the validity of the contracts executed with Local 402 and concluded that, since Local 402 was not a certified bargaining unit and was not a bargaining unit which had been proven to represent a majority of the employees, the contracts with Local 402 were not a bar to an election. The board specifically *declined* to reach the question of whether an unfair labor practice had been committed in violation of General Statutes § 31-105 (3), concluding instead that it was "unnecessary to decide whether the contracts were also invalid because they resulted from employer assistance and domination of Local 402."

The fact that the board admitted into evidence facts which may have constituted an unfair labor practice is purely coincidental; see *National Labor*

*Relations Board* v. *Dayton Motels, Inc.*, 474 F.2d 328, 333 (6th Cir.); since there was no adjudication of such a violation by the board. Moreover, sanctions peculiar to unfair labor practice proceedings were not imposed by the board in the present case.[7] Hence, the defendants' claim that the board, in fact, decided an unfair labor practice case is without merit.

The final claim of the defendants is that they were not given notice of the true nature of the proceedings before the board and that they were prejudiced by the absence of written unfair labor practice charges. This claim is clearly unfounded since, as we have pointed out, there was no adjudication of an unfair labor practice by the board. Moreover, the transcript is replete with instances in which the defendants were given every opportunity to present their claims and positions. From the start of the very first hearing, counsel for the defendants was given notice of, and acquiesced in, the procedure the board would follow. Throughout the hearings, which were held on five separate days extending over a five-month period from April 21 through August 18, 1976, the board extended full due process opportunities to the defendants; at no time did they lack adequate notice of the proceedings to be followed nor were they curbed by the board from pre-

---

[7] For instance, General Statutes § 31-107 (c) provides, in pertinent part, that "[i]f . . . the board determines that the employer has engaged in or is engaging in any unfair labor practice, it shall state its finding of fact and shall issue and cause to be served on such employer an order requiring him to cease and desist from such unfair labor practice, and shall take such further affirmative action as will effectuate the policies of this chapter, including, but not limited to: (1) Withdrawal of recognition from and refraining from bargaining collectively with any company union, established, maintained or assisted by any action defined in this chapter as an unfair labor practice . . . ."

senting their case freely and completely. It is obvious that under all the circumstances of this case the defendants were accorded full due process safeguards. The board's admission into evidence, at the representation hearing, of facts which may have constituted an unfair labor practice does not compel a contrary conclusion.

There is no error.

In this opinion the other judges concurred.