### AUTOTOTE ENTERPRISES, INC. v. STATE OF CONNECTICUT, DIVISION OF SPECIAL REVENUE
### (SC 17299)

Sullivan, C. J., and Norcott, Palmer, Vertefeuille and Zarella, Js.*

---

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

Argued October 27, 2005—officially released May 9, 2006

*Robert F. Vacchelli*, assistant attorney general, with whom, on the brief, was *Richard Blumenthal*, attorney general, for the appellant (defendant).

*Robert D. Tobin,* with whom was *F. Jerome O'Malley,* for the appellee (plaintiff).

*Opinion*

ZARELLA, J. The sole issue in this appeal is whether the moratorium on the expansion of off-track betting facilities imposed by General Statutes § 12-571a precludes the plaintiff, Autotote Enterprises, Inc., from broadcasting live racing while simultaneously advertising the availability of telephone wagering during the broadcasts. The defendant, the state of Connecticut, division of special revenue,[1] appeals from the judgment of the trial court sustaining the plaintiff's appeal from a declaratory ruling[2] by the defendant that Connecticut's statutory moratorium on the expansion of off-track betting prohibited the plaintiff from broadcasting live racing while simultaneously advertising the availability of telephone wagering on the races being broadcast. The defendant claims that the trial court improperly sustained the appeal because the plaintiff's proposed plan is in clear violation of the moratorium, not an authorized gambling activity and, therefore, prohibited, and violates other public policy considerations. We affirm the judgment of the trial court.

The following undisputed facts and procedural history, as set forth in the trial court's memorandum of decision, are relevant to this appeal. "[The plaintiff] owns and operates a system of off-track betting in Con-

[1] Shoreline Star Greyhound Park and Entertainment Complex, LLC, intervened as a defendant. In the interest of simplicity, we refer to the state of Connecticut, division of special revenue, as the defendant.

[2] The ruling was approved by the state gaming policy board. The defendant and the gaming policy board are administrative units within the state department of revenue services. See General Statutes §§ 12-557c and 12-557d. The two entities are cooperatively responsible for the implementation and administration of chapters 226 and 226b of the General Statutes, which concern off-track betting, dog racing, jai alai and the state lottery. The defendant is headed by an executive director. General Statutes § 12-557c (b).

necticut, subject to the regulatory authority of the [defendant]. On May 21, 2003, [the plaintiff] petitioned the [defendant] for a declaratory ruling as to whether the moratorium on off-track betting facilities imposed by § 12-571a applies to its proposed contracts with cable [television] operators for the live broadcast of racing events, where those broadcasts would contain advertisements for the sale of off-track [telephone] betting accounts by [the plaintiff].

"On September 22, 2003, the [defendant] issued a declaratory ruling, approved by the [state gaming policy] board on October 9, 2003, concluding that while [the plaintiff] could legally televise races and accept wagers by telephone, any advertisement of its telephone betting system during live broadcasts of racing events would violate § 12-571a by creating off-track betting facilities in excess of the moratorium imposed by that statute."

The plaintiff appealed to the trial court pursuant to General Statutes § 4-183. The trial court sustained the plaintiff's appeal, concluding that the moratorium does not apply to private households receiving the plaintiff's proposed broadcasts and advertisements. The defendant appealed to the Appellate Court from the trial court's judgment sustaining the plaintiff's appeal, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. Additional facts will be set forth as necessary.

I

The defendant first claims that the plaintiff's proposed program to promote telephone betting services during or in connection with its cable television broadcasts of racing and jai alai events would violate the statutory moratorium because it would, in effect, expand simulcast gambling venues without authorization. The plaintiff responds that its proposed program

would not violate the moratorium because it would create no new "facilities" within the meaning of § 12-571a and the applicable regulations. We agree with the plaintiff.

The defendant's claim involves a question of statutory interpretation. It has long been established that, when interpreting a statute, "[o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature." (Internal quotation marks omitted.) *Perodeau* v. *Hartford*, 259 Conn. 729, 735, 792 A.2d 752 (2002). "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." General Statutes § 1-2z.

"Ordinarily, this court affords deference to the construction of a statute applied by the administrative agency empowered by law to carry out the statute's purposes. . . . [A]n agency's factual and discretionary determinations are to be accorded considerable weight . . . . Cases that present pure questions of law, however, invoke a broader standard of review than is ordinarily involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . . Furthermore, when [an] agency's determination of a question of law has not previously been subject to judicial scrutiny . . . the agency is not entitled to special deference. . . . [I]t is for the courts, and not administrative agencies, to expound and apply governing principles of law." (Internal quotation marks omitted.) *Wood* v. *Zoning Board of Appeals*, 258 Conn. 691, 698, 784 A.2d 354 (2001). The defendant's claim involves questions of

law that we have not considered previously. Our review is therefore plenary. See id., 699.

General Statutes § 12-571a (a) establishes a moratorium on the expansion of off-track betting facilities and provides in relevant part: "The [d]ivision of [s]pecial [r]evenue and the [g]aming [p]olicy [b]oard shall not operate or authorize the operation of more than eighteen off-track betting branch facilities . . . ."[3] By its own terms, the moratorium does not apply to off-track betting generally but, rather, to the number of off-track betting facilities that may be operated within the state. Our resolution of the defendant's claim therefore turns on whether the homes receiving the plaintiff's proposed broadcast are properly characterized as "off-track betting facilities."

We begin our analysis with the relevant statutory text and administrative regulations. See *Teresa T.* v. *Ragaglia*, 272 Conn. 734, 751, 865 A.2d 428 (2005) ("[a]dministrative rules and regulations are given the force and effect of law" [internal quotation marks omitted]). Neither § 12-571a (a) nor any other provision of

---

[3] The first phrase of General Statutes § 12-571a (a) refers to "off-track betting *branch* facilities . . . ." (Emphasis added.) The text of § 12-571a, however, indicates that the terms "branch facility" and "facility" are synonymous, and are used interchangeably throughout the statutory scheme. For instance, General Statutes § 12-571a (a) provides in relevant part: "Any *facility* approved prior to December 31, 1986, shall be included within the eighteen *branch facilities* authorized by this subsection." (Emphasis added.) General Statutes § 12-571a (b) likewise provides in relevant part: "The eighteen off-track betting *branch facilities* authorized by subsection (a) of this section may include eight *facilities* which have screens for the simulcasting of off-track betting race programs or jai alai games . . . provided . . . four of such *facilities* shall be located in the town and city of New Haven, the town of Windsor Locks, within the dog race track in the town of Plainfield and within the fronton or dog race track in the town and city of Bridgeport. . . ." (Emphasis added.)

To our knowledge, § 12-571a is the only provision of the General Statutes to use the term "off-track betting branch facility." Other provisions governing off-track betting use the term "off-track betting facility" almost exclusively.

the statutory scheme expressly defines the term "off-track betting facility." Section 12-574-F1 of the Regulations of Connecticut State Agencies, however, defines an off-track betting "facility" as "the total real estate, land and buildings of an association[4] or OTB facility operator,[5] either owned or leased, utilized for the purpose of conducting . . . off-track betting . . . ."[6] Regs., Conn. State Agencies § 12-574-F1 (a) (28). Subdivision (53) of subsection (a) of the same regulation defines "OTB" or "off-track betting" as "the acceptance of off-track betting wagers from the public on events held both within and without the state as authorized by the division [of special revenue] . . . ." Regs., Conn.

---

[4] An "association" is "any person licensed to . . . operate the off-track betting system . . . ." Regs., Conn. State Agencies § 12-574-F1 (a) (4). It is undisputed that the plaintiff is an association within the meaning of this definition. In fact, the plaintiff is the *only* person licensed to operate the off-track betting system.

[5] An "OTB facility operator" is defined as, inter alia, "a licensed concessionaire under contract with the OTB association licensee to operate an off-track betting facility . . . ." Regs., Conn. State Agencies § 12-574-F1 (a) (54). Because the plaintiff is the off-track betting association licensee; see footnote 4 of this opinion; this category necessarily excludes the plaintiff.

[6] The regulatory definition of off-track betting "facility" is consistent with the multitude of other statutory and regulatory provisions suggesting that a "facility" is necessarily a premises controlled by an association or off-track betting facility operator and utilized for the purpose of accepting wagers. See, e.g., General Statutes § 12-572 (a) (permitting executive director of defendant to establish off-track betting facilities "for the purpose of receiving moneys wagered on the results of races"); General Statutes § 12-574 (k) (permitting executive director of defendant "to visit, to investigate and to place expert accountants" in off-track betting facilities); Regs., Conn. State Agencies § 12-574-F4 (c) (requiring associations and off-track betting facility operators to provide defendant with offices and parking within each facility); Regs., Conn. State Agencies § 12-574-F4 (j) (requiring associations and off-track betting facility operators to maintain cleanliness and safety of each facility); Regs., Conn. State Agencies § 12-574-F4 (n) (permitting officials of defendant "the right of full and complete entry to any and all parts of the association's facilities"); Regs., Conn. State Agencies § 12-574-F5 (a) (forbidding admission of intoxicated persons or those under influence of illicit drugs into facility); Regs., Conn. State Agencies § 12-574-F14 (f) (prohibiting association from knowingly permitting admission of minor into facility).

State Agencies § 12-574-F1 (a) (53). Significantly, the relevant statutes and regulations make no reference to advertising as one of the defining characteristics of a "facility."

Applying the regulatory definition of an off-track betting facility in the present context, we conclude that the plaintiff's proposal would not result in the creation of new off-track betting facilities. The households receiving the plaintiff's proposed broadcasts would not be "real estate, land [or] buildings . . . owned or leased" by an association. Moreover, they would not be utilized for the purpose of accepting off-track betting wagers from the public.[7] The households receiving the plaintiff's proposed broadcasts therefore would not be new off-track betting facilities, and the plaintiff's proposal would not violate the moratorium.

We further note that the defendant's argument is logically inconsistent. On the one hand, it concedes that the operation of the telephone betting system, namely, a system allowing bets to be placed remotely by telephone, is permissible under the statutory scheme. See Regs., Conn. State Agencies § 12-574-F60.[8] On the other hand, it claims that coupling advertising with the live broadcasting of racing events and telephone betting creates an off-track betting "facility" for purposes of the moratorium. Because there is no mention of advertising or the broadcasting of events in the definition of "facility"; see Regs., Conn. State Agencies § 12-574-F1 (a) (28); the defendant's claim of illegality must turn on the ability of homeowners to place telephone bets from property that they "own or lease." This flies in the face of the defendant's concession that telephone

---

[7] If anything, the households would be used for the purpose of *placing* off-track betting wagers *by* the public.

[8] Section 12-574-F60 of the Regulations of Connecticut State Agencies governs the placing of off-track betting wagers by telephone.

betting is allowed under the statutory scheme, a concession that it is forced to make by virtue of § 12-574-F60.

Faced with this regulatory and statutory language, the defendant concedes that "[t]he [trial] court was correct to note that, technically, a home is not a facility within the framework envisioned by the statute" but nonetheless contends that the plaintiff's proposal violates the moratorium. As we have demonstrated, however, this argument is untenable because it requires us to disregard the definitions contained in the regulations and the statutory mandates.

## II

The defendant next argues that it has no authority to approve the plaintiff's proposed program because Connecticut maintains a "general [public] policy against gambling unless specifically permitted by law," and the plaintiff's plan to combine live racing broadcasts with advertisements for telephone wagering is not specifically permitted by law. The plaintiff responds that its proposal does not contravene Connecticut's public policy against gambling because material components of the program are permitted by statute or regulation. The plaintiff also notes that it entered into a purchase agreement with the state to acquire the state's off-track betting operation pursuant to General Statutes § 12-571, and that agreement, when considered in conjunction with the statutory authorization, is clearly in accord with the state's public policy regarding off-track betting. We agree with the plaintiff.

The following additional undisputed facts are relevant to our resolution of this claim. Connecticut's off-track betting system was established in 1971. See Public Acts 1971, No. 865, § 15. From that time until July 1, 1993, the state owned the off-track betting system and the defendant operated it. As part of the system, the defendant broadcasted a television program entitled,

"OTB Tonight," featuring live racing, commentary and advertisements regarding how to establish telephone betting accounts and how to place bets using the telephone betting system. "OTB Tonight" aired from September, 1990, through March, 1991.

Pursuant to a purchase agreement with the defendant, the plaintiff acquired ownership of, and the right to operate, the off-track betting system on July 1, 1993.[9] In the agreement, the defendant represented to the plaintiff that "[t]he operation of the OTB System ha[d] been conducted in substantial compliance with all applicable laws and regulations . . . ." The purchase agreement also incorporated a proposal that the plaintiff had submitted detailing its goals and intentions vis-à-vis the off-track betting system. In its proposal, the plaintiff expressed its commitment to "aggressively explore an alliance with various [cable television] markets, to enhance coverage of racing and increase revenues from telephone wagering."

In July, 1994, the plaintiff wrote to the defendant seeking to confirm the permissibility of "showing . . . live racing events [on cable television] in Connecticut, the advertisement of telephone betting in connection therewith, and the acceptance of telephone and branch wagers on such races." The defendant replied by letter on August 5, 1994, stating that, as long as the plaintiff did not "conduct broadcasting of live-racing events at branch facilities and . . . wagering [was] limited to those tracks [that were] approved by the [defendant], there [were] no prohibitions set forth in either the . . . General Statutes or the [o]ff-[t]rack [b]etting [r]egula-

---

[9] In 1993, the General Assembly passed Public Acts 1993, No. 93-332, § 29 (P.A. 93-332), which empowered the defendant's executive director to negotiate and enter into a contract to sell the "off-track betting system including, but not limited to, the assets and liabilities of the system and *the right to operate the system.*" (Emphasis added.) Public Act 93-332, § 29, subsequently was codified at § 12-571.

tions regarding any of the [plaintiff's proposed activities]." Thereafter, the plaintiff broadcasted live races in the manner described in its letter but eventually discontinued the broadcasts "for business reasons." On October 6, 1994, in response to a request for information from Senator William A. DiBella, the defendant's executive director sent a letter to DiBella explaining the history of the telephone betting operations of the off-track betting system. The letter described, inter alia, past efforts of the state to promote its television racing program as well as the plaintiff's program that then was airing.

The legislature speaks on matters of public policy through legislative enactments and through the promulgation of regulations by state agencies as authorized by statute. See, e.g., *State* v. *New England Health Care Employees Union*, 271 Conn. 127, 136–37, 855 A.2d 964 (2004). The defendant's public policy claim therefore raises an issue of statutory interpretation. As in all matters of statutory interpretation, we apply a de novo standard of review on appeal because the issue is one of law. See, e.g., *Wood* v. *Zoning Board of Appeals*, supra, 258 Conn. 699.

Connecticut maintains a public policy regarding gambling that is most clearly articulated in General Statutes §§ 53-278a through 53-278g, which criminalize certain gambling related activities. We also have recognized this state's generally restrictive policy on gambling in our case law. See *Casanova Club* v. *Bisharat*, 189 Conn. 591, 598, 458 A.2d 1 (1983); see also *Hilton International Co.* v. *Arace*, 35 Conn. Sup. 522, 528, 394 A.2d 739 (1977) ("there is . . . a strong policy against gambling, except where it is authorized specifically by our statutes").

Certain gambling activities, however, including the broadcast of live races and the provision of telephone

wagering, are specifically exempted from the statutory prohibitions against gambling. Section 53-278g provides in relevant part: "(a) Nothing in sections 53-278a to 53-278g, inclusive, shall be construed to prohibit the *publication of an advertisement of, or the operation of, or participation in,* a state lottery, pari-mutuel betting at race tracks licensed by the state, *off-track betting conducted by the state* or a promotional drawing for a prize or prizes . . . ."[10] (Emphasis added.) General Statutes § 53-278g (a); cf. Regs., Conn. State Agencies §§ 12-574-F6 (c) (1). It is therefore clear that one of the gambling activities permitted under § 53-278g (a) is off-track betting.

We accordingly conclude that the plaintiff's proposal to combine live racing broadcasts with advertisements for telephone wagering does not contravene Connecticut's public policy against gambling. The general public policy against gambling, as expressed in §§ 53-278a through 53-278g, does not apply to this method of gambling and does not prohibit the advertising of this form of gambling. Moreover, the state's policy regarding off-track betting is addressed in great detail by statutes and regulations, none of which prohibits the activities in which the plaintiff seeks to engage as described in its request for a declaratory ruling. See General Statutes § 12-571a (a); Regs., Conn. State Agencies §§ 12-574-F1 and 12-574-F60. Furthermore, the policy decision of the legislature to permit the state to operate an off-track betting system, including the advertisement of betting in conjunction with a live televised racing show, was extended to a private entity in 1993 when the legislature enacted Public Acts 1993, No. 93-332, § 29 (P.A. 93-332), which authorized the sale of the off-track betting

---

[10] Subsection (a) of § 53-278g has not been amended since its enactment in 1973. See Public Acts 1973, No. 73-455. The provision thus predated the state's involvement in telephone betting in conjunction with the broadcast of live racing events.

system. Indeed, P.A. 93-332, § 29, specifically authorized the defendant's executive director to sell "the off-track betting system including, but not limited to, the assets and liabilities of the system and the *right to operate the system.*" (Emphasis added.) Accordingly, the plaintiff's proposal is consistent with the public policy of this state.[11]

Our conclusion, which is based on a review of the statutes and regulations, finds additional support in the defendant's historic attitude toward programs similar to the one proposed by the plaintiff. As we have described, the defendant broadcasted a substantially identical program before the 1993 sale of the off-track betting system to the plaintiff. When completing the sale of the off-track betting system to the plaintiff, the defendant knew of the plaintiff's intention to broadcast such programs and even warranted its legality. After the sale of the off-track betting system to the plaintiff, the defendant confirmed the permissibility of a substantially identical proposal by the plaintiff. We therefore reject the defendant's argument that advertising the availability of telephone betting during televised live racing is impermissible under the law.

### III

Finally, the defendant advances a series of policy arguments highlighting the alleged evils of the plaintiff's proposal, specifically the problem of gambling addic-

---

[11] The plaintiff claimed before the trial court that the declaratory ruling violated its right to free speech under the first and fourteenth amendments of the United States constitution. Because we resolve this appeal in favor of the plaintiff solely on the basis of its statutory claim, we need not reach the plaintiff's constitutional claim. We note, however, that our interpretation of the relevant statutory provisions and regulations is consistent with the plaintiff's claim that it has a right, under the first amendment, to advertise telephone wagering in connection with its off-track betting operation. See *State* v. *Metz*, 230 Conn. 400, 422–23, 645 A.2d 965 (1994) (court must search for interpretation of statute that avoids placing it in constitutional jeopardy); *Nastro* v. *D'Onofrio*, 76 Conn. App. 814, 821, 822 A.2d 286 (2003) (same).

tion. These considerations, however, lie outside of the purview of this court and properly are addressed to the General Assembly and other policymakers. See *Connecticut State Labor Relations Board* v. *Connecticut Yankee Greyhound Racing, Inc.*, 175 Conn. 625, 640, 402 A.2d 777 (1978) ("courts . . . must guard against the danger of sliding unconsciously from the narrow confines of law into the more spacious domain of policy").

The judgment is affirmed.

In this opinion the other justices concurred.