******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# TOWN OF MIDDLEBURY *v.* FRATERNAL ORDER OF POLICE, MIDDLEBURY LODGE NO. 34 ET AL.
## (AC 44061)

Bright, C. J., and Moll and Bear, Js.

*Syllabus*

The plaintiff town appealed to the Superior Court from the decision of the defendant State Board of Labor Relations determining that the town had unilaterally changed an established past practice of including extra duty pay in the calculation of pensions for members of the defendant union, M Co., in violation of the Municipal Employees Relations Act (§ 7-467 et seq.). The town established a retirement committee to administer its retirement plan, consisting of three members appointed by the town. In the midst of ongoing negotiations with M Co. for a successor collective bargaining agreement, the retirement committee notified M Co. that it had decided to exclude extra duty pay from pension calculations. M Co. filed a complaint with the labor board, alleging that the town violated the act when the retirement committee unilaterally eliminated extra duty pay from pension calculations. The town claimed, inter alia, that the labor board lacked jurisdiction over the complaint because the retirement committee was not a municipal employer under the act as defined by statute (§ 7-467). The labor board issued a finding that the town violated the statute (§ 7-470 (a) (4)) requiring municipal employers to bargain in good faith when the retirement committee excluded extra duty pay from the calculation of pensions. The labor board found, inter alia, that there was a consistent past practice of including extra duty pay in pension calculations that had endured for almost thirty years. It rejected the town's contract defense, concluding that M Co. had not waived its right to bargain over changes to the calculation of future retirement benefits. The labor board applied its well established standard that a waiver must be clear and unmistakable. During the pendency of the town's administrative appeal, the National Labor Relations Board issued a decision in *MV Transportation, Inc.* (368 N.L.R.B. No. 66), in which it abandoned the clear and unmistakable waiver standard for determining whether a union has waived its right to bargain over an otherwise mandatory subject of bargaining in favor of the contract coverage standard in cases over which it had jurisdiction. Because the National Labor Relations Board held that its newly adopted rule applied retroactively to all pending cases, the trial court remanded the town's case to the labor board to determine whether it would adopt the new standard. The labor board subsequently issued an order declining to adopt the contract coverage standard, and the court dismissed the town's administrative appeal, finding that the town had failed to demonstrate any illegality, abuse of discretion, or prejudice to its rights in the labor board's decision. On the town's appeal to this court, *held*:

1. The town could not prevail on its claim that the labor board improperly determined that it had jurisdiction over M Co.'s prohibited practice complaint: there was substantial evidence in the record to support the labor board's conclusion that the retirement committee was acting as the town's agent, as the town board of selectmen controlled the composition of the retirement committee under its authority to appoint and remove committee members, the town charter and retirement plan vested in the town the authority to amend or cancel the retirement plan and, in deciding to exclude extra duty pay from pension calculations, the retirement committee relied on the legal opinion of the town attorney; moreover, contrary to the town's claim, the labor board did not fail to adhere to its own administrative precedent, as those prior labor board decisions addressed actions by a retirement committee in administering a plan with regard to specific employee applications, not actions effecting unilateral change to the terms of a plan, and those decisions did not address an agency relationship between pension boards and cities; furthermore, the labor board's decision did not violate the town's

rights under the Home Rule Act (§ 7-188) as the labor board's finding that the retirement committee was acting as the town's agent when it unilaterally effected the change at issue did not deprive the town of the right to legislate on purely local affairs or invalidate the town's charter or retirement plan; additionally, the labor board did not exceed its jurisdiction, as it properly considered the terms of the town's charter and retirement plan to the extent necessary to resolve M Co.'s prohibited practice complaint.

2. The town could not prevail on its claim that the labor board, in considering the town's defense to M Co.'s unilateral change complaint, failed to apply the contract coverage standard: the labor board was not compelled to follow the policy adopted by the National Labor Relations Board in *MV Transportation*, *Inc.*, and it did not act illegally, arbitrarily, or in abuse of its discretion in declining to adopt the contract coverage standard; moreover, this court declined to consider the town's unpreserved argument that the labor board misapplied the clear and unmistakable waiver standard to the facts it found.

Argued November 8, 2021—officially released May 10, 2022

*Procedural History*

Appeal from the decision of the defendant State Board of Labor Relations determining that the plaintiff's change in its practice of including extra duty pay in the calculation of pensions for members of the named defendant violated the Municipal Employees Relations Act, brought to the Superior Court in the judicial district of New Britain, where the court, *Hon. Stephen F. Frazzini*, judge trial referee, remanded the case to the defendant State Board of Labor Relations to determine whether a decision of the National Labor Relations Board applied retroactively; thereafter, the case was tried to the court, *Hon. Stephen F. Frazzini*, judge trial referee; judgment dismissing the appeal, from which the plaintiff appealed to this court. *Affirmed*.

*Thomas G. Parisot*, with whom was *Connor McNamara*, for the appellant (plaintiff).

*Frank Cassetta*, general counsel, with whom were *J. Brian Meskill*, and, on the brief, *Harry B. Elliot, Jr.*, former general counsel, for the appellee (defendant State Board of Labor Relations).

*David S. Taylor*, for the appellee (named defendant).

*Opinion*

BRIGHT, C. J. The plaintiff, the town of Middlebury (town), appeals from the judgment of the trial court dismissing the town's administrative appeal from the decision of the defendant State Board of Labor Relations (labor board). The labor board found that the town violated the Municipal Employee Relations Act (act), General Statutes § 7-467 et seq., by unilaterally changing an established past practice of including extra duty pay in the calculation of pensions for members of the defendant Fraternal Order of Police, Middlebury Lodge No. 34 (union), the union representing the town's police officers. On appeal, the town claims that the labor board improperly (1) concluded that it had jurisdiction over the union's prohibited practice complaint and (2) applied the incorrect standard for evaluating the town's contract defense to the unilateral change complaint. We disagree and, accordingly, affirm the judgment of the trial court.

The labor board found the following relevant facts. The town is a municipal employer under the act, and the union is an employee organization representing all full-time employees of the town's police department with authority to exercise police powers, except for the chief of police. By town meeting on March 22, 1967, the town established the Town of Middlebury Retirement Plan (retirement plan) and created the Retirement Plan Committee (retirement committee) to administer the plan. The three members of the retirement committee are appointed by the town's board of selectmen and must include one employee of the town, one member of the town's board of finance, and one citizen of the town. Under the retirement plan, the retirement committee "shall have complete authority in all matters pertaining to the administration of the [retirement] [p]lan." In addition, the retirement plan "may be amended, modified or discontinued in a [t]own [m]eeting held for that purpose."

In 1987, the town adopted a municipal charter, which provided that the provisions of the retirement plan "shall remain in full force and effect until such time as said plan is amended."

By town meeting on June 5, 1995, the town amended the retirement plan, changing, among other things, the definition of "salary" from "the actual compensation received from the [t]own in any plan year" to "the actual compensation paid to the employee by the [t]own in any calendar year . . . ." Section 7.2 of the retirement plan provides that "[t]he primary responsibility of the [retirement] [c]ommittee is to administer the [retirement] [p]lan for the exclusive benefit of the [m]embers and their [b]eneficiaries, subject to the specific terms of the [retirement] [p]lan. The [c]ommittee shall administer the [retirement] [p]lan in accordance with its terms

. . . and shall have the power to determine all questions arising in connection with the administration, interpretation, and application of the [retirement] [p]lan. Any such determination by the [c]ommittee shall be conclusive and binding upon all affected parties.

"The [c]ommittee may correct any defect, supply any information, or reconcile any inconsistency in such manner and to such extent as shall be deemed necessary or advisable to carry out the purpose of the [retirement] [p]lan, provided, however, that any interpretation or construction shall be done in a nondiscriminatory manner. The [c]ommittee shall have all powers necessary or appropriate to accomplish its duties under the [retirement] [p]lan." Under § 7.6 of the retirement plan, "[t]he [t]own reserves the right at any time and from time to time by action of [t]own meeting to modify, amend or terminate the [retirement] [p]lan."

By town meeting on August 25, 2011, the town established the Town of Middlebury Defined Contribution Retirement Plan (defined contribution plan) to provide pension benefits for town employees hired on or after July 1, 2011. Under the defined contribution plan, " '[c]ompensation' " is defined as a "participant's wages as defined in [Internal Revenue] Code [§] 3401 (a) and all other payments of compensation by the [e]mployer (in the course of the [e]mployer's trade or business) for a [p]lan [y]ear . . . ."

The town and the union are parties to a series of successive collective bargaining agreements. The relevant collective bargaining agreement at issue before the labor board was effective from July 1, 2013, through June 30, 2017 (agreement). Under article XVI of the agreement, "[t]he [t]own agrees to maintain in effect for the duration of this [a]greement the [retirement] [p]lan dated July 1, 1967, as amended on July 1, 1995, and to further amend the [r]etirement [p]lan to provide that employees retiring after twenty (20) years shall receive credit for [2.5 percent] of the average pay per year of service for the first twenty years of service and [2] percent for years 21 through 30 with a maximum benefit accrual of [70 percent]. . . . The employee contribution to the Middlebury Retirement Fund shall be [4.6 percent] for the duration of this agreement. . . . Those employees hired on or after July 1, 2013, shall become members of the . . . [d]efined [c]ontribution [p]lan as developed by the [retirement committee], as approved at a [t]own [m]eeting on August 25, 2011."

Article VI, § 1, of the agreement provides for " 'special police duty' " or " 'extra police work' " (extra duty), defined as "assignment for work during off-duty hours for some other party or entity other than the police department or other than the [t]own." Article XVII, § 2, provides that "[a]ll benefits, rights and privileges enjoyed by the employees prior to entering into this [a]greement which are not specifically provided for or

which are not relinquished or abridged by or in conflict with the other provisions of this [a]greement are hereby made a part of and protected by this [a]greement."

The labor board found that "[union] members have regularly worked extra duty. 'Extra duty' is work performed in the capacity of a police officer that is voluntary, occurs outside the member's normal work hours, is not performed as part of the member's normal duties, and is paid for by an entity other than the police department (e.g., a private contractor or another municipal department). Such entities pay the town the applicable rate for extra duty hours worked as well as an administrative surcharge assessed by the town. The town includes pay for extra duty hours worked in [union] members' regular paychecks and when it receives funds from third party entities, the town reimburses itself for such payments and retains the administrative surcharges. . . .

"[S]ince on or before 1988, the town included extra duty pay as 'salary' when calculating and paying pension benefits to [union] members and when calculating and collecting employee pension contributions, to the extent that such contributions were assessed, pursuant to the [retirement plan]. . . . [F]rom the inception of the defined contribution plan, the town included extra duty pay as 'compensation' when calculating and collecting employee or matching pension contributions to said plan." (Footnotes omitted.)

In March, 2017, the town and the union began negotiations for a successor agreement to the agreement expiring on June 30, 2017. On August 10, 2017, amidst ongoing negotiations, the retirement committee "met and discussed the impact of [union] extra duty [pay] on the [retirement plan]. [The] town chief financial officer, Lawrence Hutvagner, informed the [retirement committee] that, while third party entities reimbursed the town for extra duty pay, extra duty was a liability of the [retirement plan]. The [retirement committee] members then unanimously voted to have the town attorney clarify whether extra duty pay was properly included in [retirement plan] benefit calculations."

In an October 23, 2017 memorandum addressed to the retirement committee, the town attorney, Robert W. Smith, who was representing the town in the negotiations with the union, claimed that "[t]he definition of salary, as amended in 1995, in conjunction with the addition of [§] 7.2 (which vests conclusive plan interpretation in the [retirement committee]), certainly allows the [retirement committee] to vote, consistent with its interpretation, on the issue of whether the [retirement plan] includes/excludes extra duty pay in/from pension calculations, going forward." Smith averred that the 1995 change to the definition of salary "is significant, inasmuch as extra duty pay, although always 'received from' the town, was always 'paid' by private parties.

The fact that the money is passed through the town does not change who actually pays it (private parties)."

On October 24, 2017, the retirement committee voted unanimously to clarify that extra duty pay is not included in a member's "salary" or "compensation" as defined in the retirement plan and the defined contribution plan. In a January 30, 2018 letter, the retirement committee informed the union that the committee had decided to exclude all extra duty pay from pension calculations and that the town would refund the pension contributions withheld against such pay during the period of January 1, 2010, through October 24, 2017. The board noted that the town's records regarding union members' wages "cannot differentiate members' extra duty earnings from members' other earnings prior to [January 1, 2010]."

On January 24, 2018, the union filed a complaint[1] with the labor board alleging that the town violated the act when the retirement committee unilaterally eliminated extra duty pay from the calculation of members' pensions. In response, the town claimed that the board lacked jurisdiction over the complaint because the retirement committee, which had engaged in the conduct at issue, is a separate legal entity from the town and is not a municipal employer under the act. In the alternative, the town claimed that the union had waived its right to bargain as to the change at issue because the agreement incorporated by reference the retirement plan, which authorizes the retirement committee "to determine all questions arising in connection with the administration, interpretation, and application of the [retirement plan]" and provides that "[a]ny such determination . . . shall be conclusive and binding upon all affected parties."

After a three day hearing, the labor board issued its decision on December 21, 2018,[2] finding that the town violated General Statutes § 7-470 (a) (4) when the retirement committee excluded extra duty pay from the calculation of members' pension benefits.[3] The labor board first determined that it had jurisdiction to adjudicate the union's prohibited practice complaint because, although the retirement committee is not a municipal employer under the act,[4] the retirement committee's change to the calculation of retirement benefits was attributable to the town under principles of agency law. The labor board then determined that the union had established a prima facie case of unlawful unilateral change to a term or condition of employment. Specifically, the labor board found that there was a consistent past practice of including extra duty pay in the calculation of pension benefits that had endured for almost thirty years before the retirement committee's October, 2017 meeting. The labor board rejected the town's contract defense, concluding that the union had not waived its right to bargain over changes to the calculation of future retirement benefits by referencing the retirement plan in the par-

ties' agreement. In so concluding, the labor board applied its well established standard for determining whether a union has waived its right to bargain over an otherwise mandatory subject of bargaining, which requires that the waiver be clear and unmistakable. See, e.g., *In re State of Connecticut*, Conn. Board of Labor Relations Decision No. 2859 (October 30, 1990) p. 5 ("[t]o constitute a waiver of rights . . . the waiver must be clear and unmistakable").

The town appealed from the labor board's decision to the Superior Court pursuant to General Statutes § 4-183.[5] After the parties appeared for oral argument and submitted briefs in the trial court, the National Labor Relations Board (NLRB) issued a decision in which it abandoned the clear and unmistakable waiver standard in favor of the contract coverage standard in cases over which it has jurisdiction. See *MV Transportation, Inc.*, 368 N.L.R.B. No. 66 (September 10, 2019). Because the NLRB held that the newly adopted rule applies retroactively to all pending cases, the trial court remanded the present case to the labor board to consider whether to adopt the new federal standard in Connecticut and, if so, whether to apply it retroactively in the present case.

On December 12, 2019, the labor board issued an order declining to adopt the contract coverage standard, and the court issued its decision dismissing the town's appeal on March 12, 2020. The court determined that the labor board's decision was supported by substantial evidence and that the town had failed to demonstrate any illegality, abuse of discretion, or prejudice to its rights in the labor board's decision. This appeal followed. Additional facts will be set forth as necessary.

We begin with the applicable standard of review for both of the plaintiff's claims. "[J]udicial review of an administrative agency's action is governed by the Uniform Administrative Procedure Act (UAPA), General Statutes § 4-166 et seq., and the scope of that review is limited. . . . [R]eview of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable. . . . Neither this court nor the trial court may retry the case or substitute its own judgment for that of the administrative agency on the weight of the evidence or questions of fact. . . . Conclusions of law reached by the administrative agency must stand if . . . they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts. . . . The court's ultimate duty is only to decide whether, in light of the evidence, the [agency] has acted unreasonably, arbitrarily, illegally, or in abuse of [its] discretion." (Internal quotation marks omitted.) *AFSCME, AFL-CIO, Council 4, Local 2405* v. *Norwalk*, 156 Conn. App. 79, 85–86, 113 A.3d 430 (2015).

I

The town first claims that the labor board improperly determined that it had jurisdiction over the union's prohibited practice complaint. The town argues that, in finding that the retirement committee's decision to exclude extra duty pay from pension calculations was attributable to the town under principles of agency law, the labor board (1) misapplied the law of agency, (2) failed to adhere to its own administrative precedent, (3) failed to consider the import of Connecticut's Home Rule Act, General Statutes § 7-188, and (4) exceeded its authority under the act by considering whether the retirement plan had been modified. We address each argument in turn.

A

We first address the town's argument that the labor board misapplied the law of agency. "The existence of an agency relationship is a question of fact . . . which may be established by circumstantial evidence based upon an examination of the situation of the parties, their acts and other relevant information. . . .

"Three elements are required to show the existence of an agency relationship: (1) a manifestation by the principal that the agent will act for him; (2) acceptance by the agent of the undertaking; and (3) an understanding between the parties that the principal will be in control of the undertaking. . . . [A]n essential ingredient of agency is that the agent is doing something at the behest and for the benefit of the principal." (Citations omitted; internal quotation marks omitted.) *Bank of America, N.A.* v. *Gonzalez*, 187 Conn. App. 511, 516–17, 202 A.3d 1092 (2019). "[T]he labels used by the parties in referring to their relationship are not determinative; rather, a court must look to the operative terms of their agreement or understanding." (Internal quotation marks omitted.) *National Publishing Co.* v. *Hartford Fire Ins. Co.*, 287 Conn. 664, 678, 949 A.2d 1203 (2008).

In its decision, the labor board explained that "[c]ourts have found the absence of a specific enabling statute to be dispositive in determining that a municipal body is not a distinct body politic. . . . The sole applicable enabling statute, [General Statutes] § 7-450,[6] does not afford the [retirement committee] legal status independent of the town. . . . Furthermore, the record before us reflects the three elements necessary to establish an agency relationship . . . . We find the first two elements in the town's establishment of the [retirement committee] and the pension plans at issue. As to the third element, we note that it is only the general *right* to control, and not the actual exercise of specific control that must be established, that [a]gents may be vested with considerable discretion and independence in *how* they perform their work for the principal's benefit, yet still be deemed subject to the principal's general

right to control, and that the control needed to establish the relation of master and servant may be very attenuated. . . .

"The town created the [retirement committee], which exists for the sole purpose of administering a town retirement plan according to its terms. This function does not include the power to modify or to amend the terms of the plans as that authority is expressly reserved to the town's legislative body, not the [retirement committee]. . . .

"Purporting to administer the pension plans in the absence of a specific application for benefits, the [retirement committee] substantially changed the terms of the plans, diminishing [union] members' future benefits to the town's advantage. We need not assess whether this conduct was unauthorized or ultra vires because . . . the town has ratified the [retirement committee's] conduct. . . . Absent a statute affording the [retirement committee] independent legal status, we cannot but find that it is [the town's] agent acting with actual authority and we reject the specious argument that these circumstances afford the town a valid means to circumvent its duty under the act to negotiate substantial changes to [union] members' future pension benefits with the union." (Citations omitted; emphasis in original; footnote added; footnotes omitted; internal quotation marks omitted.)

On appeal, the town argues that, as to the first two agency elements, "[u]ncontested evidence established that the [retirement committee] constitutes an independent committee, comprised of members from labor, management, and the electorate, with the independent purpose of providing administrative and fiduciary oversight of the retirement plan(s)." As to the third element, the town argues that it "has no oversight capability with respect to the [retirement committee]; it cannot direct the [retirement committee] and it cannot review the [retirement committee's] authorized actions pursuant to its duties."

The labor board responds that, "[v]iewed as a whole, the [retirement plan's] language limiting the [retirement committee's] role to 'administer[ing] the [retirement plan]' and reserving to the town the exclusive right to 'amend, modif[y] or discontinue' the plan terms, evidences an understanding that the town, not the [retirement committee], is in overall control of the undertaking." For its part, the union argues that, "[b]y handpicking all three members of the [retirement committee], the town controls not just the one member [whom] the town characterizes as 'management,' but the entire panel. . . . [T]he [retirement committee] actively coordinated with the town attorney . . . who would later represent the town before the labor board, to justify reduction of the pension benefit[s] of union members. . . . This is not the behavior of an independent body."

We agree with the labor board and the union.

In support of its argument, the town principally relies on § 7.2 of the retirement plan, which provides that the retirement committee's primary responsibility is to administer the retirement plan for the exclusive benefit of the members and grants the retirement committee "conclusive and binding" authority "to determine all questions arising in connection with the administration, interpretation, and application of the [retirement plan]." Although these provisions arguably support the town's position, as the retirement committee's decisions are binding on the town as well as the union, the significance of these provisions is diminished by other provisions in the charter and retirement plan that support the labor board's finding of agency.

For example, the town charter provides that, "[i]n order to provide for the proper administration of the business of the [t]own, the boards, commissions and committees specified [herein] shall, except as otherwise provided herein, be appointed by the [b]oard of [s]electmen by a majority vote of the entire [b]oard to perform the duties and functions herein provided or provided in the General Statutes . . . ." The charter further provides that the retirement committee members are "appointed to *serve* the [b]oard of [s]electmen in accordance with and subject to the provisions of the [t]own [o]rdinances and the General Statutes." (Emphasis added.) Under the retirement plan, "[t]he term of office of each member of the [retirement] [c]ommittee shall be subject to determination by the [b]oard [of selectmen]. A [c]ommittee member . . . may be removed by the [b]oard [of selectmen] by delivery to such member of written notice of removal, to take effect at a date specified therein, or upon delivery of such written notice to the [c]ommittee if no date is specified."

These provisions establish that the town created the retirement committee to serve the town's board of selectmen by administering the town's retirement plan. The board of selectmen controls the composition of the retirement committee under its authority to appoint and remove committee members. In addition, because the town reserves the right to amend or terminate the retirement plan, the town has the authority to eliminate the retirement committee or limit the retirement committee's authority to administer the retirement plan. Indeed, as noted by the court, the town, by town meeting, "may just as easily remove the [retirement committee's] power to administer or interpret the [retirement plan] as it did in assigning those responsibilities to [the retirement committee]." Accordingly, because the charter and the retirement plan vest in the town the authority to appoint and remove individual members of the retirement committee and to amend or cancel the retirement plan itself, it reasonably follows that the town maintains the right to control the retirement committee.

Furthermore, in deciding to exclude extra duty pay from the calculation of members' retirement benefits, the retirement committee relied on the legal opinion of the town attorney, who was representing the town in ongoing negotiations with the union. Consequently, it reasonably follows that the retirement committee understood that the town wanted the retirement committee to "interpret" the retirement plan in accordance with the town attorney's opinion. See, e.g., *LeBlanc* v. *New England Raceway, LLC*, 116 Conn. App. 267, 275, 976 A.2d 750 (2009) ("[a]n agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act" (internal quotation marks omitted)). Thus, although there may be evidence in the record that supports the town's position, we conclude that there is substantial evidence in the record to support the labor board's findings and that its conclusion that the retirement committee was acting as the town's agent logically follows from the facts found.

## B

The town next argues that the labor board failed to follow its own precedent holding that the labor board "[does] not have jurisdiction over [prohibited practice] complaints alleging unilateral change[s] attributed to municipal pension boards analogous to the [retirement committee]." We disagree.

In its decision, the labor board addressed its prior decisions in *In re City of Norwalk*, Conn. Board of Labor Relations Decision No. 3885 (October 22, 2002), and *In re City of Milford*, Conn. Board of Labor Relations Decision No. 3701 (June 10, 1999). The labor board distinguished these cases, noting that "[t]he [retirement committee] . . . must necessarily act independent of the town in specific cases if it is to administer [retirement] plan terms notwithstanding the town's vested interest in conserving finite resources and its obligations to 'make contributions . . . sufficient to make all benefit payments . . . .' Citing [*In re City of Milford* and *In re City of Norwalk*], the town argues [that] our past recognition of this autonomy supports its claim that the [retirement committee's] actions in this case are not attributable to the town through basic principles of agency. We are not persuaded.

"In [*In re*] *City of Milford*, a union did not contest an arbitration award denying a grievance challenging a rejection of a disability pension application on the basis that the pension board making [that] decision was autonomous and acted independent of the municipal employer. We subsequently dismissed the . . . prohibited practice complaint for the same reason as res judicata. Similarly, in [*In re*] *City of Norwalk*, a union

accepted the municipal employer's resolution of grievances challenging a pension board's refusal to afford applicants survivorship options and we dismissed the union's unilateral change complaint because the applicants failed to avail themselves of the appeals provision in the pension plan. Both cases involved pension board decisions in cases involving specific employee applications and reason that, while the municipal employer 'is the entity responsible for negotiating pension benefits, that responsibility clearly does not extend to having control over the decisions of the pension board itself . . . . [B]y agreeing to the pension plan, the parties have agreed to this status and function of the pension board.' . . .

"Purporting to administer the pension plans in the absence of a specific application for benefits, the [retirement committee] substantially changed the terms of the plans, diminishing [union] members' future benefits to the town's advantage." (Citation omitted; footnote omitted.)

The town claims that the labor board draws "an artificial distinction" between *In re City of Milford* and *In re City of Norwalk* in concluding "that, because this case arose in the context of general plan administration—and not in the context of an application for benefits—that the [retirement committee] is not an independent entity and was acting as an agent of the town. This conclusion disregarded the substantial evidence presented to the [labor] board." We are not persuaded.

Although the town minimizes the distinction drawn by the labor board, the labor board found it to be significant, noting that the retirement committee had not administered the plan when it effected the unilateral change but rather "substantially changed the terms of the plans, diminishing [union] members' future benefits to the town's advantage." Moreover, in *In re City of Milford* and *In re City of Norwalk*, the labor board did not address the elements of an agency relationship and, instead, summarily found that there was insufficient evidence for it to conclude that either pension board was an agent of the respective city. In the present case, by contrast, the labor board found substantial evidence to support a finding of an agency relationship, and, as we concluded in part I A of this opinion, the record supports the labor board's findings. Accordingly, we conclude that the labor board reasonably determined that the decisions in *In re City of Milford* and *In re City of Norwalk* were distinguishable from the present case.

### C

The town next argues that the labor board, by focusing on the absence of an enabling statute granting the retirement committee independent legal status, disregarded "the fact that the town's charter, including its [retirement plan] and the designation of the [retirement

committee] therein, constitutes the organic law of the town pursuant to [the] Home Rule Act."[7] We are not persuaded.

"It is settled law that as a creation of the state, a municipality has no inherent powers of its own. . . . A municipality has only those powers that have been expressly granted to it by the state or that are necessary for it to discharge its duties and to carry out its objects and purposes. . . . The Home Rule Act . . . is the relevant statutory authority. Under the [Home Rule] [A]ct, municipalities have the power to adopt a charter to serve as the organic law of that municipality. . . . It is well established that a [town's] charter is the fountainhead of municipal powers. . . . The charter serves as an enabling act, both creating power and prescribing the form in which it must be exercised. . . .

"The purpose [of the act] is clearly twofold: to relieve the General Assembly of the burdensome task of handling and enacting special legislation of local municipal concern and to enable a municipality to draft and adopt a home rule charter or ordinance which shall constitute the organic law of the [municipality], superseding its existing charter and any inconsistent special acts. . . . The rationale of the act, simply stated, is that issues of local concern are most logically answered locally, pursuant to a home rule charter, exclusive of the provisions of the General Statutes. . . . Moreover, home rule legislation was enacted to enable municipalities to conduct their own business and [to] control their own affairs to the fullest possible extent in their own way . . . upon the principle that the municipality itself [knows] better what it want[s] and need[s] than . . . the state at large, and to give that municipality the exclusive privilege and right to enact direct legislation which would carry out and satisfy its wants and needs. . . . Consistent with this purpose, a state statute cannot deprive [municipalities] of the right to legislate on purely local affairs germane to [municipal] purposes. . . . Consequently, a general law, in order to prevail over a conflicting charter provision of a [municipality] having a home rule charter, must pertain to those things of general concern to the people of the state . . . ." (Citations omitted; internal quotation marks omitted.) *Cook-Littman* v. *Board of Selectmen*, 328 Conn. 758, 768–69, 184 A.3d 253 (2018).

The town argues that, "pursuant to the Home Rule Act, the charter and the [retirement] plan define that all issues related to pension administration must be determined exclusively by the [retirement committee]. . . . The provisions of the [retirement] plan vest in the [retirement committee] the exclusive authority to interpret the plan provisions. As such, the determination of whether the salary contributions and benefit calculations include police extra duty pay falls squarely within the [retirement committee's] enumerated pow-

ers and duties. Further, the [retirement committee's] conclusion with respect to whether police extra duty pay constitutes salary does not conflict with any statutory mandate or any definition or requirement set forth in the charter or the plan itself." In its reply brief, the town further argues that "the state does not have an interest in whether the town's police officers' extra duty pay is included in or excluded from their pension benefit calculations. This is a matter of local concern and the Home Rule Act should apply."

Because the labor board's decision neither deprives the town of the right to legislate on purely local affairs nor invalidates the town's charter or retirement plan, it is unclear how the Home Rule Act undermines the labor board's finding that the retirement committee was acting as the town's agent when it unilaterally effected the change at issue. To the extent that the town suggests that the Home Rule Act allows the town to avoid its statutory obligation to bargain with the union regarding changes to a mandatory subject of bargaining, we are not persuaded. Aside from the additional description of the charter and the retirement plan as the "organic law" of the town, the town simply restates its argument that the provisions of the retirement plan establish the independence of the retirement committee. The labor board rejected this argument and concluded that the retirement committee was acting as the town's agent, and we have determined that this conclusion is supported by substantial evidence in the record. Accordingly, we conclude that the labor board's decision did not violate the town's rights under the Home Rule Act.

### D

Finally, the town argues that, "assuming arguendo, that the [labor] board had jurisdiction over the [retirement committee], its order remains outside the scope of the subject matters that it has jurisdiction to adjudicate." Specifically, the town argues that "[d]etermining whether a public retirement system plan has been modified (properly or defectively) is not within the [labor] board's powers and it cannot decide a prohibited practice complaint premised on a legal determination that it is not empowered to make." We are not persuaded.

The labor board has jurisdiction to adjudicate a prohibited practice complaint under General Statutes § 7-471 (5), which provides in relevant part: "Whenever a question arises as to whether a practice prohibited by sections 7-467 to 7-477, inclusive, has been committed by a municipal employer or employee organization, the [labor] board shall consider that question . . . ." In *Piteau* v. *Board of Education*, 300 Conn. 667, 689, 15 A.3d 1067 (2011), our Supreme Court noted that, although the labor board "is not the proper body to resolve contract disputes that do not involve an allegation of a prohibited labor practice, [there is] no authority . . . to support [a] claim that the [labor board] may

not exercise jurisdiction over a breach of contract claim when it is interdependent with a claim over which the [labor board] does have jurisdiction.''

In the present case, the union filed a prohibited practice complaint alleging that the town unilaterally changed a term or condition of employment as to which it was required to bargain with the union. Under § 7-471 (5), the labor board had jurisdiction to consider whether such a unilateral change occurred and, in considering that issue, the labor board found that the town had changed a condition of employment by reducing the future retirement benefits of union members without bargaining. Thus, the labor board had jurisdiction to consider the terms of the retirement plan insofar as it was necessary to resolve the prohibited practice complaint, over which the labor board had jurisdiction. See id., 688–89; see also *National Labor Relations Board* v. *Strong*, 393 U.S. 357, 361, 89 S. Ct. 541, 21 L. Ed. 2d 546 (1969) (''[T]he [NLRB] may proscribe conduct which is an unfair labor practice even though it is also a breach of contract remediable as such by arbitration and in the courts. . . . It may also, if necessary to adjudicate an unfair labor practice, interpret and give effect to the terms of a collective bargaining contract.'' (Citation omitted.)). Stated differently, the labor board properly considered the terms of the charter and retirement plan to the extent necessary to resolve the union's prohibited practice complaint. Accordingly, we conclude that the labor board did not exceed its jurisdiction in the present case.

In sum, for all of the foregoing reasons, we conclude that the labor board's findings are supported by substantial evidence in the record and that its conclusion that it had jurisdiction to consider the union's prohibited practice complaint reasonably follows from the facts found.

## II

Finally, the town claims that the labor board, in considering the town's defense to the union's unilateral change complaint, improperly failed to apply the contract coverage standard, as adopted by the NLRB in *MV Transportation, Inc.*, supra, 368 N.L.R.B. No. 66.

The following legal principles regarding the unilateral change doctrine are relevant to the town's claim. In *National Labor Relations Board* v. *Katz*, 369 U.S. 736, 743, 82 S. Ct. 1107, 8 L. Ed. 2d 230 (1962), the United States Supreme Court held that an employer violates § 8 (a) (5) of the National Labor Relations Act (NLRA), when, without first bargaining to impasse, the employer unilaterally changes a term or condition of employment that is a mandatory subject of bargaining. Although *Katz* involved a unilateral change during negotiations for an initial collective bargaining agreement, ''[t]he *Katz* doctrine has been extended as well to cases where

. . . an existing agreement has expired and negotiations on a new one have yet to be completed." *Litton Financial Printing Division* v. *National Labor Relations Board*, 501 U.S. 190, 198, 111 S. Ct. 2215, 115 L. Ed. 2d 177 (1991).

Likewise, a municipal employer and an employee organization "have the duty to bargain collectively . . . ." General Statutes § 7-469. "[A] unilateral change to an employment condition constitutes an unlawful refusal to negotiate under the [act]. . . . To establish a unilateral change of a condition of employment, the union must establish that the employment practice was clearly enunciated and consistent, [that it] endure[d] over a reasonable length of time, and [that it was] an accepted practice by both parties. . . .

"However, not all unilateral changes made by an employer constitute a refusal to bargain, such as when the change does not amount to a substantial change in a major term or condition . . . or where the collective bargaining agreement gives express or implied consent to the type of unilateral action involved." (Citations omitted; emphasis omitted; footnote omitted; internal quotation marks omitted.) *Board of Education* v. *State Board of Labor Relations*, 299 Conn. 63, 73–74, 7 A.3d 371 (2010).

Although both this court and our Supreme Court have "had little occasion to address the standards that apply in determining whether a union has established a violation of labor law under the unilateral change doctrine, the [labor] board has applied the doctrine in many cases over many years." Id., 73 n.8.

In the present case, the town does not dispute that employees' pension benefits are a condition of employment that are a mandatory subject of collective bargaining under the act or that the inclusion of extra duty pay in the calculation of pension benefits was a clearly enunciated and consistent past practice. See *West Hartford Education Assn., Inc.* v. *DeCourcy*, 162 Conn. 566, 576, 295 A.2d 526 (1972) ("[t]he significance of calling something a 'condition of employment' is that it then becomes a mandatory subject of collective bargaining"); see also *Allied Chemical & Alkali Workers of America, Local Union No. 1* v. *Pittsburgh Plate Glass Co.*, 404 U.S. 157, 180, 92 S. Ct. 383, 30 L. Ed. 2d 341 (1971) ("future retirement benefits of active workers are part and parcel of their overall compensation and hence a well-established statutory subject of bargaining"). Instead, the town claimed that the union had waived its statutory right to bargain regarding the change to the calculation of members' pensions because the references to the retirement plan and the defined contribution plan in article XVI of the parties' agreement authorized the retirement committee's unilateral action.

"Because waiver of statutory rights by unions is disfa-

vored, the purported waiver must be clear and unmistakable. . . . Waiver may be established by either an express provision in the collective bargaining agreement, or by the conduct of the parties, including past practices and bargaining history. . . . An employer relying on a claim of waiver of a duty to bargain bears the burden of demonstrating it clearly and unmistakably." (Citations omitted; internal quotation marks omitted.) *Greater Bridgeport Transit District* v. *State Board of Labor Relations*, 43 Conn. Supp. 340, 358, 653 A.2d 229 (1993), aff'd, 232 Conn. 57, 653 A.2d 151 (1995).

In the present case, the labor board, applying the clear and unmistakable waiver standard, rejected the town's defense, explaining that "[n]either the collective bargaining agreement nor the [retirement] plan documents contain the unequivocal and specific language necessary to waive the union's right to bargaining over removal of extra duty compensation from pension calculations and contributions. There is no mention of the role of extra duty pay in either plan, the specific past practice at issue. As to past practices in general, consideration of extra duty pay for pension purposes is, in our view, protected under [article] XVII, § 2, of the collective bargaining agreement as a '[benefit], [right] and [privilege] enjoyed by the employees' that was not 'relinquished or abridged by or in conflict with the other provisions' of the agreement. Nor do we find that the 1995 amendments to the [retirement] plan . . . made any significant change to the [retirement committee's] authority. The [retirement committee] already had 'complete authority in all matters pertaining the administration' of the [retirement plan] under the 1967 plan document and the town does not contend that the [retirement committee] is empowered to perform functions in addition to that role."

Until recently, the NLRB also applied the clear and unmistakable waiver standard when considering an employer's defense to a unilateral change complaint. See *MV Transportation, Inc.*, supra, 368 N.L.R.B. No. 66, slip op., p. 4. "This standard is predicated on the union's *waiver* of its right to insist on bargaining, and it requires bargaining partners to unequivocally and specifically express their mutual intention to permit unilateral employer action with respect to a particular employment term, notwithstanding the statutory duty to bargain that would otherwise apply." (Emphasis in original; internal quotation marks omitted.) Id.

Now, however, under the contract coverage standard recently enunciated in *MV Transportation, Inc.*, the NLRB "will assess the merits of [an employer's] defense by undertaking the more limited review necessary to determine whether the parties' collective-bargaining agreement covers the disputed unilateral change (or covered it, if the disputed change was made during the term of an agreement that has since expired). In doing

so, the [NLRB] will give effect to the plain meaning of the relevant contractual language, applying ordinary principles of contract interpretation; and the [NLRB] will find that the agreement covers the challenged unilateral act if the act falls within the compass or scope of contract language that grants the employer the right to act unilaterally. . . . Accordingly, [the NLRB] will not require that the agreement specifically mention, refer to or address the employer decision at issue. . . . Where contract language covers the act in question, the agreement will have authorized the employer to make the disputed change unilaterally, and the employer will not have violated [§] 8 (a) (5) [of the National Labor Relations Act (NLRA)]." (Citation omitted; internal quotation marks omitted.) Id., 11.

The NLRB noted that the contract coverage standard encourages employers and unions "to foresee potential labor-management relations issues, and resolve those issues through collective bargaining in as comprehensive a manner as practicable. Moreover, by ensuring that *all* provisions of the parties' agreement are given effect, the contract coverage test will end the [NLRB's] practice of selectively applying exacting scrutiny only to those provisions of a labor contract that vest in the employer a right to act unilaterally. The contract coverage test will also end the [NLRB's] practice of sitting in judgment on certain provisions of the parties' agreement—contrary to the authoritative teaching of the Supreme Court—by refusing to give effect to those provisions unless a standard of specificity is met that is, in practice, all but impossible to meet. By adopting contract coverage, [the NLRB] will also ensure that [its] contract interpretations remain within the [NLRB's] limited authority to interpret collective-bargaining agreements in the exercise of [its] primary jurisdiction to administer the [NLRA], but because [the NLRB] will apply the same standard the courts apply, [its] interpretations will predictably align with theirs as well. Finally, adopting contract coverage will discourage forum shopping. Since the [NLRB] will resolve unilateral-change disputes under the same standard that arbitrators apply, there will no longer be any incentive to bypass grievance arbitration, and such disputes will be channeled into the method agreed upon by the parties . . . ." (Emphasis in original; footnote omitted; internal quotation marks omitted.) Id., 9.

One member of the NLRB, Lauren McFerran, issued a separate opinion in *MV Transportation, Inc.*, concurring in part and dissenting in part. McFerran noted her disapproval with the NLRB's decision to overrule seventy years of NLRB precedent by abandoning the clear and unmistakable waiver standard. Id., 25 (Member McFerran, concurring in part and dissenting in part). She explained that the United States Supreme Court endorsed the clear and unmistakable waiver standard in *National Labor Relations Board* v. *C & C Plywood*

*Corp.*, 385 U.S. 421, 430–31, 87 S. Ct. 559, 17 L. Ed. 2d 486 (1967), holding that the NLRB properly concluded that a contested provision in a collective bargaining agreement did not authorize the employer's unilateral action. *MV Transportation, Inc.*, supra, 368 N.L.R.B. No. 66, slip op., p. 29 (Member McFerran, concurring in part and dissenting in part); see also *C & C Plywood Corp.*, 148 N.L.R.B. 414, 416 (1964) ("Waiver of a statutory right will not lightly be inferred. The relinquishment to be effective must be 'clear and unmistakable.' "). In *National Labor Relations Board* v. *C & C Plywood Corp.*, supra, 430, the United States Supreme Court reasoned that, "[i]n reaching [its] conclusion, the [NLRB] relied upon its experience with labor relations and the [NLRA's] clear emphasis upon the protection of free collective bargaining. We cannot disapprove of the [NLRB's] approach. For the law of labor agreements cannot be based upon abstract definitions unrelated to the context in which the parties bargained and the basic regulatory scheme underlying the context."

In her opinion concurring in part and dissenting in part, McFerran also explained that "the theory of contract coverage originated with the District of Columbia Circuit, decades after *C & C Plywood* [*Corp.*] was decided. The [c]ircuit's seminal 1993 decision in [*National Labor Relations Board* v. *United States Postal Service*, 8 F.3d 832 (D.C. Cir. 1993)] is notable both for its failure to address the [United States] Supreme Court's decision in *C & C Plywood* [*Corp.*] and for its inconsistency with [c]ircuit precedent endorsing the [NLRB's] waiver standard. . . .

"There is no acknowledgment in [*United States*] *Postal Service* that the waiver doctrine was (even then) long and firmly established in [NLRB] law, no acknowledgment that the District of Columbia Circuit had previously rejected the [NLRB's] deviation from the waiver standard, and no acknowledgment that the Supreme Court had approved the [NLRB's] application of the waiver standard in *C & C Plywood* [*Corp.*]. . .

"From this flawed analytical foundation, the [District of Columbia] Circuit reached a flawed result imposing a new test that leading labor law scholars have criticized. Those scholars observe that the [NLRB's] waiver standard is more consistent with the policy of the [NLRA] and that statutory policy is better realized when bargaining over real and pressing matters is not held hostage to linguistic contests over hypothetical future contingencies." (Citations omitted; footnotes omitted; internal quotation marks omitted.) *MV Transportation, Inc.*, supra, 368 N.L.R.B. No. 66, slip op., 30–31 (Member McFerran, concurring in part and dissenting in part).

We note that the contract coverage standard has been considered and adopted by a minority of federal circuit courts of appeal. At the time *MV Transportation, Inc.*, was decided, only the First, Seventh, and District of

Columbia Circuits had adopted the contract coverage standard. See id., 29 n.41 (Member McFerran, concurring in part and dissenting in part). Recently, the Second Circuit also adopted the contract coverage standard, noting that it would "defer to the [NLRB's] interpretations of the NLRA—including with respect to the legal standard governing an unfair labor practice charge—as long as its interpretations are 'rational and consistent with the [NLRA].' " *International Brotherhood of Electrical Workers, Local Union 43* v. *National Labor Relations Board*, 9 F.4th 63, 70–71 (2d Cir. 2021). After considering the NLRB's analysis in *MV Transportation, Inc.*, the Second Circuit concluded that it would "defer to the [NLRB] and adopt the contract coverage standard as rational and consistent with the [NLRA]." Id., 73. The United States Supreme Court and the remaining federal circuits have not addressed whether they should similarly defer to the NLRB and abandon the clear and unmistakable waiver test in favor of the contract coverage standard.

In the present case, the town claims that the contract coverage standard should apply, arguing that the labor board's continued application of the clear and unmistakable waiver standard raises the same issues as those identified by the NLRB and "runs counter to the framework set out by the Connecticut Supreme Court with respect to interpreting collective bargaining agreements." The labor board responds that the NLRB's decisions are not binding precedent and that its decision to adhere to the waiver standard is entitled to deference. We agree with the labor board.

We begin by noting that "[t]he Connecticut labor board, like the NLRB, has broad discretion in administering the state labor laws." *Connecticut State Labor Relations Board* v. *Connecticut Yankee Greyhound Racing, Inc.*, 175 Conn. 625, 638, 402 A.2d 777 (1978). "While the interpretation of provisions of the federal act may be extremely helpful, however, neither the state board nor our courts are compelled to slavishly follow policies which have been adopted by the NLRB for the purpose of ensuring administrative efficiency at the federal level." Id., 633–34.

As previously noted in this opinion, the labor board declined to adopt the contract coverage standard. The labor board has applied the clear and unmistakable waiver standard for decades, and that standard has been affirmed by our Supreme Court. See *Greater Bridgeport Transit District* v. *State Board of Labor Relations*, 232 Conn. 57, 64, 653 A.2d 151 (1995) (adopting trial court's decision as "a statement of the facts and the applicable law"). Moreover, although the United States Supreme Court has endorsed the clear and unmistakable waiver standard, it has not considered the NLRB's application of the contract coverage standard. In addition, as the agency tasked with enforcing the labor laws of this

state, the labor board's policy decision is entitled to deference. See *Connecticut State Labor Relations Board* v. *Connecticut Yankee Greyhound Racing, Inc.*, supra, 175 Conn. 640 ("[b]ecause the relation of remedy to policy is peculiarly a matter for administrative competence, courts must not enter the allowable area of the [labor] [b]oard's discretion and must guard against the danger of sliding unconsciously from the narrow confines of law into the more spacious domain of policy" (internal quotation marks omitted)). Consequently, just as the Second Circuit, in *International Brotherhood of Electrical Workers, Local Union 43*, deferred to the NLRB, we similarly defer to the labor board in this case. For these reasons, we conclude that the labor board did not act illegally, arbitrarily or in abuse of its discretion in declining to adopt the contract coverage standard.[8]

Finally, we note that the town did not claim in either its principal or reply brief to this court that the labor board misapplied the clear and unmistakable waiver standard to the facts it found. Nevertheless, at oral argument before this court, counsel for the town, for the first time, argued that the town should prevail under the clear and unmistakable waiver standard, as well as the contract coverage standard. Because the town did not properly brief whether the labor board correctly applied the clear and unmistakable waiver standard, we decline to consider it. See *In re Adelina G.*, 56 Conn. App. 40, 42, 740 A.2d 920 (1999) ("[b]ecause the issue was raised for the first time during oral argument and, therefore, has not been properly briefed, we decline to consider it").

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The complaint was filed by NIPSEU-Middlebury Police Union (NIPSEU), but the union replaced NIPSEU as the recognized representative for the bargaining unit in February, 2018.

[2] The board initially issued its decision on December 14, 2018, but it issued a corrected decision on December 21, 2018, to correct minor clerical errors.

[3] General Statutes § 7-470 provides in relevant part: "(a) Municipal employers or their representatives or agents are prohibited from . . . (4) refusing to bargain collectively in good faith with an employee organization which has been designated in accordance with the provisions of said sections as the exclusive representative of employees in an appropriate unit . . . ."

[4] Under the act, a municipal employer is defined as "any political subdivision of the state, including any town, city, borough, district, district department of health, school board, housing authority or other authority established by law, a private nonprofit corporation which has a valid contract with any town, city, borough or district to extinguish fires and to protect its inhabitants from loss by fire, and any person or persons designated by the municipal employer to act in its interest in dealing with municipal employees . . . ." General Statutes § 7-467 (1).

[5] General Statutes § 4-183 provides in relevant part: "(a) A person who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision may appeal to the Superior Court as provided in this section. . . ."

[6] General Statutes § 7-450 provides in relevant part: "(a) Any municipality or subdivision thereof may, by ordinance, or with respect to a municipality not having the authority to make ordinances, by resolution adopted by a two-thirds vote of the members of its legislative body, establish pension, retirement, or other postemployment health and life benefit systems for its officers and employees and their beneficiaries, or amend any special act

concerning its pension, retirement, or other postemployment health and life benefit systems, toward the maintenance in sound condition of a pension, retirement, or other postemployment health and life benefit fund or funds, provided the rights or benefits granted to any individual under any municipal pension or retirement system shall not be diminished or eliminated. The legislative body of any such municipality, by resolution adopted by a two-thirds vote of its members, may provide for pensions to persons, including survivors' benefits for widows of such persons, not included in such pension or retirement system.

"(b) Notwithstanding the provisions of the general statutes or of any special act, charter, special act charter, home-rule ordinance, local ordinance or other local law, any municipality or subdivision thereof may, by ordinance and amendment thereto, or with respect to a municipality not having the authority to make ordinances, by resolution adopted by a two-thirds vote of the members of its legislative body, (1) establish one or more trusts, or determine to participate in a multiemployer trust, to hold and invest the assets of such pension, retirement or other postemployment health and life benefit system; (2) provide for the management and investment of such system and any such trust, including the establishment of a board or commission or the designation of an existing board or commission for such purposes; or (3) provide for the organization of and the manner of election or appointment of the members of such board or commission. . . .

"(c) The provisions of subsections (a) and (b) of this section shall not operate to invalidate the establishment by any municipality or subdivision thereof, pursuant to the provisions of any public or special act, charter, special act charter, home-rule ordinance, local ordinance or local law, of any postemployment health and life benefit system duly established prior to October 1, 2005, or of any trust duly established or board or commission duly established or designated prior to July 1, 2006, with respect to a pension, retirement or other postemployment health and life benefit system."

[7] General Statutes § 7-188 (a) provides: "Any municipality, in addition to such powers as it has under the provisions of the general statutes or any special act, shall have the power to (1) adopt and amend a charter which shall be its organic law and shall supersede any existing charter, including amendments thereto, and all special acts inconsistent with such charter or amendments, which charter or amended charter may include the provisions of any special act concerning the municipality but which shall not otherwise be inconsistent with the Constitution or general statutes, provided nothing in this section shall be construed to provide that any special act relative to any municipality is repealed solely because such special act is not included in the charter or amended charter; (2) amend a home rule ordinance which has been adopted prior to October 1, 1982, which revised home rule ordinance shall not be inconsistent with the Constitution or the general statutes; and (3) repeal any such home rule ordinance by adopting a charter, provided the rights or benefits granted to any individual under any municipal retirement or pension system shall not be diminished or eliminated."

[8] Following its decision in *MV Transportation, Inc.*, the NLRB held "that provisions in an expired collective-bargaining agreement do not cover post-expiration unilateral changes unless the agreement contained language explicitly providing that the relevant provision would survive contract expiration." *Nexstar Broadcasting, Inc.*, 369 N.L.R.B. No. 61, slip op., p. 2 (April 21, 2020), enforcement granted, *National Labor Relations Board* v. *Nexstar Broadcasting, Inc.*, 4 F.4th 801 (9th Cir. 2021); see *National Labor Relations Board* v. *Nexstar Broadcasting, Inc.*, supra, 809 ("[A]n employer may not excuse itself from its obligation to maintain status quo working conditions after the [collective bargaining agreement's] expiration by simple reference to the broad compass or scope of *expired* contractual terms. Rather, contract rights only survive expiration if the [collective bargaining agreement] explicitly so provides." (Emphasis in original.)).

In the present case, the town made the unilateral change to the retirement plan and the defined contribution plan in October, 2017, *after* the parties' agreement had expired on June 30, 2017. The provision in the parties agreement on which the town relies provides that "[t]he [t]own agrees to maintain in effect *for the duration of this* [a]*greement* the [retirement plan] dated July 1, 1967, as amended on July 1, 1995 . . . ." (Emphasis added.) Accordingly, because this provision does not contain express language providing that it will survive the contract expiration, it appears that, even if we agree with the town and adopt the contract coverage standard in Connecticut, that standard would not apply in the present case because the unilateral change at issue was made after the expiration of the collective bargaining

agreement.

_____